In the Matter of AUTUMN CORPORATION, Petitioner. SAMUEL LEDERMAN, Respondent.

Supreme Court, Special Term, Bronx County, December 5, 1949.

*Sherman S. Lawrence* and *Harry M. Garten* for petitioner.

*Jaffe & Jabronsky* for respondent.

HAMMER, J.° This is a proceeding by a landlord owner by petition to the Supreme Court to fix a reasonable rent in an amount in excess of the emergency rent being paid by the tenant respondent for business space. The proceeding is brought under the Business Rent Law (L. 1945, ch. 314, as last amd. by L. 1949, ch. 535, eff. April 11, 1949).

The statute as amended provides for the fixation of a reasonable rental by the court based upon the fair rental value of the tenant's space as of the date of the landlord's application to the court. The statute (§ 4, second paragraph) provides that " A net annual return of six per centum on the fair value of the entire property including the land, plus two per centum of principal for amortization of any mortgages thereon, or, *in the alternative,* two per centum per annum for depreciation on the fair value of the improvement, *inclusive* of the land, shall be presumed to be a reasonable return. The assessed valuation of the entire property, including land and building, as shown by the latest completed assessment-roll of the city, shall be

presumed to be the fair value of the premises, but other lawful evidence of the fair value may be offered and received." (Words italicized are the words of the 1949 amendment.)

It has been said that " only where a landlord is receiving less than a fair and reasonable return does he acquire a standing in equity that merits an affirmative mandate from the court to make him whole. * * * where a landlord finds himself making less than a fair and reasonable return he is a proper person for equitable relief under the statute, but where he is making a fair and reasonable return he lacks such status to invoke the equitable jurisdiction vested in this court. In such instance this court will leave the parties where it finds them." (*Matter of Savada [Graphic Mach. Exch., Inc.,]*, N. Y. L. J., Oct. 17, 1949, p. 861, col. 4.)

On March 23, 1949, The New York State Temporary Commission to Study Rents and Rental Conditions in its Rent Control Report (N. Y. Legis. Doc., 1949, No. 52) made the following statement:

## " Stores

" * * * The Commission is convinced that certain portions of the law affecting stores warrant amendment in order to bring about gradual decontrol, a policy to which the Commission has been committed from the beginning. This amendment is described in that part of this report devoted to an explanation of proposed amendments.

## " Amendments

" * * * (h) An alternative to 6 per cent plus 2 per cent formula is recommended to determine rental value per square foot.

" A survey by the Commission and its predecessor Committee has shown a considerable number of instances where the rent paid by certain tenants is less than would yield a fair return to the owner on the proportionate space occupied. In many cases the owner is without a remedy, because the rents received from the entire property preclude relief. ·

" Under the proposed amendment a landlord of either commercial or business property would be afforded an additional remedy by petitioning the Supreme Court to require a statutory tenant whose emergency rent for the proportionate space occupied by him is less than would yield a fair return to the landlord, to pay a rental which will give the landlord a fair return for the space so occupied. The rent so fixed would thereafter be deemed the emergency rent. Existing written leases would not be

impaired, nor would the status of those statutory tenants be changed whose rent for the proportionate space occupied by them is equal to or in excess of a rental which would yield a fair return to the landlord.''

In any event it must be borne in mind that the statute was enacted for the emergency caused by the lack of necessary business rental space due to the last war. Its primary object was to protect tenants in their occupancy and to prevent the exaction of exorbitant, unfair and unreasonable rents. It had the secondary object of providing owners of property and landlords with remedies for obtaining fair and reasonable rents by agreement, arbitration or court action to keep the statute within the constitutional limitations in respect of rights of property and freedom of contract. Obviously the statute and its provisions should be construed in the light of its beneficent objects and to enforce the remedies provided to alleviate the evils of threatened inflation, extortion and duress.

In consideration of what constitutes fair and reasonable rents the Legislature and the courts may be assumed to have in mind those elements and factors which under real estate customs and practices have generally established what constitutes a fair return on real property. Basically the law of supply and demand would govern, but in times of great emergency such as that of and following war statutory regulation became necessary to prevent the evils stated. Bearing this in mind, it would seem that a reasonable construction of the amended statute (L. 1949. ch. 535) will continue the statute as a shield against unfair and unreasonable rents, inflation, extortion and duress and also provide a reasonable means within usual and customary real estate practices by which owners and landlords may remedy unfairness and inequity to them.

The statute in its alternative method provides for a 6% return on the fair value of the land and the building plus 2% per annum for *depreciation* of the fair value of the *improvement inclusive of the land.*

From a real estate valuation point of view an allowance for depreciation is properly applicable to building improvements. It refers to visible or readily ascertainable physical deterioration. The building improvement is the only physically deteriorating portion of the total investment. While land can change in value and go lower than a pre-existing value by reason of a deteriorating change in neighborhood or in the general economic situation, this is not what is meant technically by the appraisal term '' depreciation ''. In any event the 6% return on the value

of the land is usually regarded as a satisfactory yield, commensurate with the risk involved in a real estate investment.

The wording of the statute seems to present a contradiction. The statute states: "plus * * * two per centum per annum for depreciation * * * of the *improvement, inclusive of the land*." (Italics supplied.) By improvement is meant structures or buildings erected upon vacant land. Land *not* built upon is usually referred to as unimproved. The language used in the statute " two per centum per annum for depreciation on the fair value of the improvement, inclusive of the land " can hardly be regarded under valuation standards as clear and unambiguous.

If the Legislature had intended an 8% return on land and building (6% plus 2%) it might be expected that the language used would have so stated simply and with unequivocal clarity. Assuming the term depreciation could be applied to land there seems to be no reason for allowing depreciation to the land in a proceeding such as this wherein generally it is alleged and claimed, as actually it is here, that the value of the land has been increasing from and after the emergency rent date down to the date of the proceeding.

A 6% return plus 2% depreciation on the building alone may be regarded as high in some instances or even excessive in others. It is usually said to be a proper yield on an investment in land adequately improved. A 6% yield could hardly be expected from land at 42d Street and Fifth Avenue improved merely with a shed for the sale of " Hot Dogs " or " Hamburgers ". Nor could a 6% yield be expected from land at Wall Street and Broadway used as a parking lot for automobiles. These are exaggerated hypotheses designed to illustrate the point. However, the relative adequacy of each improvement is an essential for the determination of the court. Only the fully adequate improvement would permit the application of a 6% yield on the value of the land. This latter point may be illustrated by a consideration of the " yield " in terms of rural land. The farmer may not reasonably expect to harvest crops from the land unless he " adequately improves " the soil through ploughing, harrowing, cultivating and tending it through " substantial investment " of his time, labor and money.

Determining a reasonable rent under the formula literally accepted and applied appears to be unsound and out of keeping with accepted real estate practice. Again, the two-fold purposes of the statute must be borne in mind. The primary objective cannot be accomplished if speculators by the amended statute are provided with the ability to increase the income of

the property from the level in existence at the time of their purchase to a level consistent with an 8% return on whatever price they agree to pay. If the rent control law permits an inflation of the price and the result inflates rent in order to yield a reasonable return on the inflated price, it would seem clear such spiraling of prices and rents could occur that inflationary rents would be no longer under the law's control. Indeed, the result ensuing might be that the purpose of the law would be thwarted. The requirement of going into court and through the motions prescribed by the statute might not be a real control as it would merely set up some artificial obstacles to the result which nevertheless could be accomplished. Control should be left either to the economic factors of supply and demand or the regulatory statute should maintain the essential purposes for which it was originally enacted. The reasonable return might have been required to be calculated on the fair market value of the property as of the date of the original statute (thus precluding speculative purchases based upon the advantages seemingly provided by the amendment) and by making allowances from year to year for increasing operating costs, maintenance and tax burdens, or in the alternative the statute might have authorized the court in its discretion to increase rents above previous levels in ratio to increasing costs consistent with the equities involved.

That the formula in the present statute, if literally applied, is out of keeping with accepted real estate practice is readily demonstrated. The relative desirability of space *normally* determines its value. This may be illustrated by the commonly known usual method of leasing space in a tower-type office building. After determining the basic return sought on the entire property, there is set up a renting schedule. In relation to full floors, the space is graded so that the lower floors are offered at lower rates than the average rate sought and the higher floors are graded to produce rates sufficiently higher than the lower floors, so as to make the average rate attainable. If the average of all office space in a tower building was, we will say, $3, the lower floors might only be rated at $2; whereas the tower floors might be rated at $5.

In relation to a divided floor, the space must be rated according to relative location on the floor. Corner space on the front of such a building, or a suite with an attractive view, would command more per square foot than an office located on a court.

From the above it is apparent a strict application of the formula prescribed by the amended statute would be unjust

and inequitable to all tenants who under usual real estate practice would be expected to pay less than the basic average rate because of occupancy of inferior space. Under the average square foot theory followed literally, speculators and unscrupulous owners of real estate could use the law designed to prevent the extortion of exorbitant, unjust and unreasonable rents to accomplish that very purpose. While adhering strictly to the emergency remedial provisions of the statute, they could perpetrate a great injustice upon such of their tenants as occupied inferior space below the average of a particular building. The above may be illustrated as follows: " A " owns a tower office building in Manhattan. In seeking an increase in rents from the building the proceeding seemingly authorized by the wording of the statute would be as follows: An 8% return would be computed, say, on the assessed value. To this sum would be added the cost of operating the building and the amount of the real estate taxes. The area of all office space would be divided into this figure to determine average square foot rental value. All cases of upper floor tenancy would be adjusted by agreement at better than the average rate, as from a practical viewpoint every tower tenant would recognize that he occupied premium space. In fact, it is quite likely that most tower tenants in a building such as that used for illustration would have been paying an agreed rent in excess of the average rate. Since under the wording of the statute all tenants are compelled to pay not less than the average rate, the tenants paying less than average would be brought to court. No offsetting credit appears to be allowed under the statute accepted literally for rent collected from other tenants at a rate in *excess of the average* recognized by the statutory formula. A more equitable formula, and perhaps that intended here, would be to substitute a formula whereby the relative desirability of all the space in the building would be set up by taking the entire space as equalling 100% and expressing the relative value of each subdivision of tenants' space in its proper ratio to 100%. Thus, no tenant could escape his proper share of the total rent allowed by the court, but no tenant would be compelled to pay more than his just and reasonable proportionate share. The relative desirability schedules would under such a formula have to be submitted as evidence at the trial through expert or other competent testimony and would be subject to the test of cross-examination.

We have used an apt illustration readily discernible in showing the impropriety of adopting an average square foot rental

for all rental space, regardless of location or relative desirability. The store building here is located on a particularly desirable avenue frontage near a less desirable side street, which nevertheless contributes somewhat to rental value because of corner influence. The store nearest to the corner is most desirable; the adjoining avenue-front store is next in value, and further away from the corner the rental value of each store is relatively less. Here the last store returns the highest per square foot rent because the occupancy is that of a bar and grill, the nature of which business requires a State liquor license, regulation and approved location.

The evidence in this proceeding under which the court is called upon to fix a reasonable rent under chapter 535 of the Laws of 1949, amending section 4 of the Business Rent Law, showed the following: The space is a store in premises 1973 and 1975 University Avenue, Bronx, New York. The space is in the one-story property situated on the west side of the avenue, 132.33 feet south of 179th Street, known as 1967–1981 University Avenue, which was purchased February 15, 1946, for $92,000, subject to a mortgage of $85,000, held by the East River Savings Bank. This mortgage was reduced upon the payment of $15,500 and a discount of $10,000, to the present principal sum of $59,500. The present cash invested amounts to about $23,000. The property presently shows a return on the equity of some 36%. The total rents per annum are $12,180. The expenses are:

| | | |
|---|---:|---:|
| Taxes | $2,646.16 | |
| Insurances | 636.38 | |
| Management | 362.91 | |
| Repairs | 89.91 | |
| | | $3,735.36 |
| Total net | | 8,444.64 |
| The assessed value is | | $100,000. |
| The expert of petitioning landlord testified the value was | | 105,000. |
| While the value of tenant's expert was $75,000 to $80,000, and not more than | | 85,000. |
| In a tax certiorari proceeding petitioner asserted a value of | | 60,000. |
| This court, although it recognizes that increased rents may sustain a higher assessed value for taxation, finds the value to be | 85,000. | $85,000. |

In respect of the value of property it could reasonably be argued that the price paid on February 15, 1946, of $92,000 was less $10,000 discount allowed by mortgagee on payment of $15,000 to reduce principal, showing a real value of $82,000.

$85,000 value segregated into land and building values by using the ratio established by assessed value for the tax year 1949–1950, viz., land assessment $70,000 = 70%

| | | |
|---|---|---|
| building | " | 30,000 = 30% |
| total | " | 100,000 = 100% |

shows a result as follows:

Value of land     =   70% of $85,000 = $59,500.
  "   of building =   30% of   85,000 =   25,500.
  "   of total    = 100% of   85,000 =   85,000.

*Rental value:*

Return on value 6% on land value of $59,500 = $3,570.
                8% on building value of   25,500 =   2,040.
                                                   ─────────
                                                   $5,610.
Compensation for operating expenses........$1,089.
Compensation for real estate taxes........... 2,646.
Total allowable rental...................... 9,345.
Building area in square feet.... 6,456.
Store area in suit.............. 2,006.
Allowable rent ..............................$9,345.
Average per square foot rate.................    1.45

The proceeding is statutory. Equitable considerations undoubtedly entered into the enactment of the law and must enter into its construction and enforcement. I do not think, however, merely because some space in a particular building is rented at a higher rent than that which might ordinarily be regarded as fair and reasonable, that a landlord or owner should be barred from obtaining a fair rental from a space therein yielding an inadequate rent. That would seem to give a premium to the tenant paying an inadequate rent at the expense both of the landlord and other tenants paying the higher rent. Equity might be concerned with reducing high rents but not with preserving unreasonably low rents. Equity may not be concerned with advantages either to owners, landlords or tenants, but with placing and keeping them in a position of fairness and reasonable equality in their rental dealings during the emergency. To deprive an owner of a fair yield for any part of his property in the possession of another might come close to a violation of

rights guaranteed by the Federal and State Constitutions. If the statute be violative of constitutional rights, its offending provisions are nullified and its purpose is unaccomplished.

Settle order on notice.