NATHAN STEINBERG et al., Appellants and Respondents, *v.* FOREST HILLS GOLF RANGE, INC., et al., Respondents and Appellants.

Submitted January 10, 1952; decided March 13, 1952.

*Harry J. Halperin* and *Samuel L. Scholer* for plaintiffs, appellants and respondents.  I. A public golf driving range is a sports arena and a place of public assembly within the meaning of the Business Rent Law.  II. The agreement for termination of the lease on 180 days' notice is enforcible under the Business

Rent Law. (*City Bank Farmers Trust Co.* v. *Rival Shoe Co.*, 198 Misc. 1002; *Lask* v. *Spitzer*, 102 N. Y. S. 2d 857; *Wood* v. *Duff-Gordon*, 222 N. Y. 88; *Myers* v. *Hussenbuth*, 32 Misc. 717; *Du Bois & Son* v. *Goldsmith Bros.*, 273 App. Div. 306.) III. The increase in rent by the Appellate Division was correct as a matter of law. (*Matter of Autumn Corp.* [*Lederman*], 197 Misc. 12; *Matter of Dworman* [*Milgrim-Christie*], 270 App. Div. 568; *Schack* v. *Handel*, 271 App. Div. 1; *Matter of Harborne Realty Corp.* [*Gottlieb*], 275 App. Div. 828; *Matter of Appleby* [*Walsh Paper Co.*], 301 N. Y. 643; *Chamberlain* v. *Feldman*, 300 N. Y. 135; *Matter of Zellner* [*Brooklyn Trust Co.*], 299 N. Y. 243.) IV. The amount of rent fixed by the Appellate Division is not unreasonable.

*William R. Distasio* for defendants, respondents and appellants. I. The Appellate Division erred in modifying the trial court's decision by increasing the annual rent. (*Schack* v. *Handel*, 271 App. Div. 1; *Matter of 76 Crown St. Corp* [*Carl & Sons*], 271 App. Div. 1030; *Matter of Barry Equity Corp.* [*Marcia Hat Co.*], 276 App. Div. 685; *Matter of Autumn Corp.* [*Lederman*], 197 Misc. 12; *Matter of Murphy* [*Blasio*], 278 App. Div. 814; *Matter of Fifth Madison Corp.* [*New York Tel. Co.*], 297 N. Y. 155; *207–17 W. 25th St. Co.* v. *Blu-Strike Safety R. B. Co.*, 277 App. Div. 93.) II. Respondents' occupancy of the premises herein is protected by the provisions of the Business Rent Law. (*1481 Broadway Corp.* v. *Maiden Lane Ballroom*, 277 App. Div. 870; *Playland Holding Corp.* v. *Nunley*, 186 Misc. 864; *Hardwood Sawdust Co.* v. *Metro Export Packers*, 187 Misc. 450; *259 Green St. Corp.* v. *Fehlhaber Pile Co.*, 186 Misc. 867.) III. The letter extending the time of cancellation is not an agreement to terminate respondents' occupancy under the Business Rent Law. (*Stern* v. *Equitable Trust Co.*, 238 N. Y. 267; *Morris Plan Corp. of America* v. *Freidus*, 81 N. Y. S. 2d 574; *Monahan Express Co. Realty Dept.* v. *Schneider Press*, 192 Misc. 960; *Beach* v. *Nixon*, 9 N. Y. 35; *Murray Realty Co.* v. *Regal Shoe Co.*, 265 N. Y. 332; *Miller* v. *Levi*, 44 N. Y. 489; *Matter of 507 Madison Ave. Realty Co.* v. *Martin*, 200 App. Div. 146, 233 N. Y. 683; *Du Bois & Son* v. *Goldsmith Bros.*, 273 App. Div. 306.) IV. The Appellate Division's modification of the trial court's determination was erroneous.

FULD, J. Plaintiffs own a plot of land, substantially unimproved, in the County of Queens, New York City, consisting of about ten acres, with an abandoned gas station on one corner. In 1947, one of plaintiffs' predecessors in title (and we hereafter refer to plaintiffs or their predecessors as " the landlord ") leased the property to the individual defendant for use as a golf driving range at a rental of $4,000 a year. The lease, later assigned to defendant corporation, was for a five-year term, but contained a provision granting the landlord an option to cancel, upon 90 days' notice, in the event, *inter alia*, of a bona fide sale. The tenant filled in and graded the land and has been using the area — and, with the landlord's permission, the building on the gas station plot — as a golf range. In addition, the tenant sells golf equipment and refreshments and furnishes a golf professional to instruct its patrons in the techniques of the sport.

In October, 1948, at the tenant's request, the provision permitting the landlord to cancel was amended, through an exchange of letters, by increasing the notice requirement to 180 days. About ten months later, such notice was given; the landlord informed the tenant that, having entered into a contract for the property's sale, it elected to terminate the lease on February 22, 1950, and demanded possession of the premises as of that date. When the tenant failed to vacate, the landlord instituted the present action, seeking a judgment (1) declaring that the lease had been cancelled, and that it is entitled to possession of the property or, in the alternative — should the court conclude that the tenancy is within the orbit of the emergency rent legislation — (2) fixing a reasonable rent in accordance with the statute.

The court at Special Term held that, while the lease had been validly terminated through the exercise of the landlord's option to cancel, the tenant had the right to continue in possession under and subject to the Business Rent Law (L. 1945, ch. 314, as amd.; McKinney's Unconsol. Laws, § 8551 *et seq.*). And, proceeding to the alternative relief demanded, Special Term found that the fair value of the property — assessed for the year 1950–1951 at $137,650 — was $220,000 and that a net annual return of 3½% (i.e., $7,700) was reasonable under the circumstances in this case. Since the sole expense of operation was

real estate taxes, which amounted to $4,501.15, the court fixed the reasonable rent at $12,201.15 a year. On appeal — by the landlord alone — the Appellate Division agreed with Special Term except as to the rent to be allowed. Concluding that the facts disclosed by the record failed to rebut " the statutory presumption that a net annual return of 8 per centum is a reasonable return," the Appellate Division set the rental, based upon such 8% rate, at $22,101.15. (278 App. Div. 856, 857.) Both parties now appeal to this court from the judgment of modification — the landlord from so much thereof as affirms Special Term's determination that the tenant's possession is protected by the emergency rent legislation and the tenant from that portion which increases the rent from $12,201.15 to $22,101.15 a year.

Considering first the landlord's appeal, we are initially called upon to decide whether the property in suit is " business space." Subdivision (a) of section 2 of the Business Rent Law (McKinney's Unconsol. Laws, § 8552, subd. [a]) defines such space as " All rental space * * * other than (1) commercial space * * * ; (2) dwelling space and meeting rooms in hotels, and dwelling space in rooming houses, apartment houses, dwelling and other housing accommodations; (3) piers, docks and wharf properties; and (4) places of public assembly." There can be no question that unimproved or inadequately improved land falls within this broad definition. To dispel any doubt on the subject, the Joint Legislative Committee to Study Rents, in recommending the adoption of amendments to the Business and Commercial Rent Laws — amendments enacted into law by chapters 272 and 273 of the Laws of 1946 — declared that " It was the intention of the Committee to include parking lots and other outdoor space in the original enactment " (N. Y. Legis. Doc., 1946, No. 46, p. 12).[1]

The landlord does not, indeed, dispute that the emergency legislation applies to unimproved land, but it contends that the

---

1. Since the enactment of those amendments, the rent laws have been held to cover unimproved land used (1) as a parking lot (*Matter of Appleby* [*Walsh Paper Co.*], 301 N. Y. 643; *Matter of Rose* [*Williams Auction Sales Corp.*], 297 N. Y. 978); (2) for the sale of used cars (*Matter of Rose* [*Williams Auction Sales Corp.*], *supra*, 297 N. Y. 978); (3) for storage (*259 Green St. Corp.* v. *Fehlhaber Pile Co.*, 186 Misc. 867); or (4) as a railroad siding (*Hardwood Sawdust Co.* v. *Metro Export Packers*, 187 Misc. 450).

use of its plottage as a golf driving range brings it within the exception, "place of public assembly." That phrase is defined in subdivision (b) of section 2 of the Business Rent Law (McKinney's Unconsol. Laws, § 8552, subd. [b]) as "A theatre, motion picture house or theatre, sports arena or stadium, meeting room or exhibition hall" — and, since hitting a golf ball is widely regarded as a sport, decision herein hinges on the meaning to be given the words "sports arena or stadium", as used in the statute. Quite obviously, a golf driving range is not a "stadium," for the basic element of seating facilities for spectators is totally absent. (Cf. Webster's New International Dictionary [2d ed., 1948], p. 2450; 21 Encyclopedia Brittanica [1946], p. 272.) And, just as clearly, it is not an "arena". Generally defined as "The central part of an amphitheatre, in which the combats or spectacular displays take place" (1 Oxford English Dictionary [1933], p. 439) or as "Any place of public contest or exertion" (Webster's New International Dictionary, *op. cit.*, p. 145), the term necessarily implies an effort before spectators, and, where sports events are involved, the element of a public contest between competitors. That the word is so employed in the statute is apparent, not only from its use in the disjunctive with "stadium," but also from the fact that it is part of the definition of "place of public assembly." As our recent holding with respect to dance halls demonstrates, mere physical exertion in public does not constitute the locale a "place of public assembly." (See *1481 Broadway Corp.* v. *Maiden Lane Ballroom,* 302 N. Y. 850.)

Since, then, a golf driving range is not excepted from the statute's coverage of "business space", defendant was privileged to remain in possession as a statutory tenant after the lease had been cancelled by the landlord (Business Rent Law, § 8; McKinney's Unconsol. Laws, § 8558; see *Du Bois & Son* v. *Goldsmith Bros.,* 273 App. Div. 306, 310) — unless there is merit to the landlord's further argument that the tenant had previously entered into an agreement, binding upon him under subdivision (g) of section 8, to "terminate his occupancy" at that time (McKinney's Unconsol. Laws, § 8558, subd. [g]). Relied on as constituting the alleged agreement is the correspondence between the parties in October, 1948, whereby the lease was amended to extend from 90 to 180 days the quantum

of notice required to be given by the landlord upon exercising the option to cancel.

The effect of section 8 of the Business Rent Law, which in broad terms prohibits the eviction or dispossession of any rent-paying tenant of business space, " notwithstanding that such tenant has no lease or that his lease or other rental agreement has expired or otherwise terminated " and " regardless of any contract, lease, agreement or obligation heretofore or hereafter entered into which is inconsistent with any of the provisions of this act," is to neutralize and render unenforcible, during the period of the emergency, any agreement or covenant binding a tenant to surrender possession of the premises occupied by him. The exceptional provisions of subdivision (g) were enacted in 1949 (L. 1949, ch. 535) to validate specific types of agreements not entered into under the compulsion of the emergency. By virtue of the portion of that subdivision here relied upon, the anti-eviction provisions of the statute are not to apply if " a tenant in possession under a lease not yet expired agrees in writing, by agreement executed not less than three months after the commencement of the term thereof, to terminate his occupancy at any time before or after expiration of the term of such lease."

The letters which are said to satisfy the requirements of the quoted clause were written more than three months after the commencement of the term, but they will be searched in vain for an agreement or covenant by the tenant to " terminate his occupancy " at any time. The parties, it is clear from a perusal of the correspondence, intended to accomplish no more than an amendment of the option provision solely in regard to the period of notice to be given to effect the exercise of the option to cancel. And, as a matter of fact, the landlord expressly stipulated that " in all other respects the terms, covenants and conditions of said lease shall remain unchanged." Manifestly, any obligation on the part of the tenant to surrender possession stemmed from the covenants in the lease as originally executed — covenants rendered unenforcible by section 8 — and not from any subsequently executed agreement by the tenant to terminate his occupancy. (Cf. *City Bank Farmers Trust Co.* v. *Rival Shoe Co.*, 198 Misc. 1002; *Monahan Express Co. Realty Dept.* v. *Schneider Press*, 192 Misc. 960.)

The remaining question presented for decision is whether the reasonable rental in this case should be computed on the basis of a net annual return of 3½%, as found at Special Term, or of 8%, as found by the Appellate Division. We are called upon to determine which of those findings more nearly accords with the weight of the evidence. (See *People ex rel. MacCracken* v. *Miller,* 291 N. Y. 55, 61.)

Our review of the evidence of the property's present use and its other economically feasible uses persuades us that the Appellate Division was in error in reversing Special Term and adopting the statute's presumptively reasonable rate of 8%. The legislature, by providing that " A net annual return of eight per centum on the fair value of the entire property including the land shall be presumed to be a reasonable return " (§ 4, subd. 1; McKinney's Unconsol. Laws, § 8554, subd. 1), has declared its finding as to the return to which a landlord is normally entitled. But that statute, merely creating a presumption, is not a mandate to employ an 8% factor in every case. Obviously, the owner of an unimproved parcel of land found to be valuable because of its availability for development cannot expect to receive the same rate of return upon its value as he would if it were appropriately improved. (See, e.g., *Matter of Appleby* [*Walsh Paper Co.*], 301 N. Y. 643; *Matter of Rose* [*Williams Auction Sales Corp.*], 297 N. Y. 978; *Schack* v. *Handel,* 271 App. Div. 1; *Matter of Murphy* [*Blasio*], 278 App. Div. 814; *Matter of Autumn Corp.* [*Lederman*], 197 Misc. 12; *Matter of City Bank Farmers Trust Co.* [*Harvey's Garages*], 201 Misc. 31.)

To ascertain the " fair value " of an unimproved parcel of land (Business Rent Law, § 4; McKinney's Unconsol. Laws, § 8554), it is proper to take into consideration the uses to which the land may be put and evaluate it in the light of its best economic use. If the highest profitable use of the land is as a site for a large housing development, the owner would neither be entitled nor expect to receive as high a return therefrom while leased and occupied as a golf driving range. An owner of inadequately improved property, whose immediate purpose is to demolish " the building or other rental area " and to construct " a new building," is not prevented by the emergency rent legislation from making such a utilization of his property. (Business

Rent Law, § 8, subd. [c]; McKinney's Unconsol. Laws, § 8558, subd. [c]; Commercial Rent Law, § 8, subd. [c]; L. 1945, ch. 3, as amd.; McKinney's Unconsol Laws, § 8528, subd. [c].) In such circumstances, the statutory tenant in occupancy of the property may be subject to eviction. However, while in possession, he may not be required, on the strength of the presumption alone, to pay a rental which will yield an 8% return on a land value based upon its highest economic use.

In the case before us, the land is not wholly unimproved, but the testimony is emphatic — from the expert witness for the landlord himself — that the present use of the property as a golf range was not its best use and that it was suitable for development by the erection of " high-class apartments " similar to those being constructed in the area. The court at Special Term was warranted, on the basis of such evidence, in concluding that the statute's presumption had been rebutted.

To urge that the rent fixed at Special Term must, nevertheless, be stamped as not reasonable because the aggregate of the taxes and the mortgage interest exceed the rental allowed, not only misconceives the objectives of the rent control legislation, but actually disregards its express provision directing that " amortization or interest paid or accrued on any incumbrances " should be excluded in the determination of " a reasonable rent " (Business Rent Law, § 4, subd. 1; McKinney's Unconsol. Laws, § 8554, subd. 1).[2]

For upwards of fifteen years, the subject property remained vacant and unrented, producing no income whatsoever for its owner, who, in common with other owners of unimproved property, had to pay real estate taxes out of pocket. When finally rented in 1947 — but two years before this proceeding was instituted — landlord and tenant agreed upon a rent of $4,000 a year, a figure some $8,000 less than that allowed at Special Term. When the present owner purchased the property,

---

2. Section 4 in part reads as follows: " In the determination of the amount of such reasonable rent: (a) due consideration shall be given to the cost of maintenance and operation of the entire property (including land and building or other rental area in which such business space is located) including amount paid for taxes assessed against such property, and to the kind, quality and quantity of services furnished, *but excluding amortization or interest paid or accrued on any incumbrances thereon* ". (Emphasis supplied.)

he knew the facts — that the property was unimproved and that it produced a rental of $4,000 a year. However, he bought the plot for $220,000, of which $40,000 was paid in cash, the balance being represented by a purchase-money mortgage of $180,000, upon which interest amounted to $8,100 a year. If the amount of interest payable on a mortgage were permitted to determine the reasonableness of the return, a property mortgaged up to its full value, reducing to zero the investment by the owner, would produce the highest rent — a manifestly absurd result.

The emergency rent laws were enacted to control rent, to protect tenants and to assure to landlords a return that was — having in mind the type and character of the property and all other relevant circumstances — reasonable, and not to guarantee to investors in real estate a net annual return or to indemnify any particular landlord against loss on his investment or speculation. The emergency rent legislation was never designed to give to a landlord a higher return under rent control than he could have obtained in its absence and in a free market.

The judgment of the Appellate Division should be modified by reducing the reasonable rental from $22,101.15 to $12,201.15 a year, and, except as so modified, affirmed, with costs to defendants in this court and in the Appellate Division.

DYE, J. (dissenting). We all agree that since the subject property has been " filled in and graded " and is being used as a " golf driving range ", it comes within the meaning of the Emergency Rent Laws and that the defendants-respondents are entitled to continue in possession as a statutory tenant during the emergency (Commercial Rent Law, § 1; L. 1945, ch. 3, as amd.; McKinney's Unconsol. Laws, § 8521 et seq.; Business Rent Law, § 1; L. 1945, ch. 314, as amd.; McKinney's Unconsol. Laws, § 8551 et seq.). We disagree as to what constitutes the reasonable rent to be charged.

When the Legislature authorized a holdover tenant to continue in possession of the premises as a statutory tenant during the emergency, it also contemplated that the holdover tenant should pay a reasonable rent. When circumstances in a given case require the fixing of a reasonable rent the statute provides that

" A net annual return of eight per centum on the fair value of the entire property including the land shall be presumed to be a reasonable return." (Commercial Rent Law, § 4, subd. 1; McKinney's Unconsol. Laws, § 8524, subd. 1; Business Rent Law, § 4, subd. 1; McKinney's Unconsol. Laws, § 8554, subd. 1.)

Here, on conflicting proof, the fair value of the property has been fixed at $220,000 which value having been affirmed in the Appellate Division is conclusive here. A majority here are about to adopt the rental as fixed at Special Term as the reasonable rent to be charged, viz., 3½% of the fair value plus taxes which will yield a return of $12,201.15, although the proof shows that the interest on the mortgage and the taxes alone amount to $12,601.15 resulting in an annual cash loss to the owner of $400 without taking into consideration the mortgage amortization payments of $10,000 per year. The Legislature, as we see it, never contemplated such a result and to avoid its happening presumed that a net annual return of 8% on the fair value including the land was a reasonable return.

It seems manifestly inconsistent to deal with the subject property as business space in order to justify a holdover tenancy and at the same time reject the statutory presumption on the theory that it is inapplicable because the property is not being devoted to its best available use.

Best available use is an element of value and as we view the record, such use, as well as the actual use, was taken into consideration in fixing the fair value of the property. Here no proof was presented by the defendants relating to the rental value of the premises, such as proof of rental value of similar space, receipts by the tenant from the operation of the activities at the premises, nor indeed any proof whatsoever tending to rebut the presumption which the statute establishes, as was done in *Matter of Appleby (Walsh Paper Co.)* (301 N. Y. 643), and *Matter of Rose (Williams Auction Sales Corp.)* (297 N. Y. 978). Thus the statutory presumption as to reasonable return on the fair value as found remains wholly unrebutted. The rental of $4,000, fixed in a lease made in 1947, with a 90-day (later increased to 180-day) *termination clause,* and under altogether different conditions, cannot outweigh the statutory presumption. The determination of Special Term gives the landlord no reasonable return, indeed no **return at**

all, but a deficit. In the absence of rebutting proof well-recognized principles require that the legislative presumption be given effect. We may not assume that the legislative pronouncement on this subject was meaningless. When so viewed, the rental return as fixed by the Appellate Division at a statutory rate of 8% of the fair value of the property plus taxes is the reasonable rent.

The judgment of the Appellate Division should be affirmed, with costs.

LOUGHRAN, Ch. J., LEWIS and DESMOND, JJ., concur with FULD, J.; DYE, J., dissents in opinion in which CONWAY and FROESSEL, JJ., concur.

Judgment accordingly. [See 303 N. Y. 1006.]