Conway, Ch. J.
In this proceeding, the landlord sought to have the rent of the tenant increased from $52,000 to $96,000 per annum pursuant to subdivision 1 of section 4 of the Business Bent Law (L. 1945, ch. 314, as amd.). The Supreme Court, New York County, after trial, dismissed the landlord’s petition, and the Appellate Division, First Department, in unanimously *619 reversing, ordered that the rent be increased to $74,125.67. In cross appeals to our court, the tenant appeals from the Appellate Division’s reversal of the trial court’s dismissal of the landlord’s petition, and the landlord appeals from the Appellate Division’s failure to increase the rent to $96,000, the amount demanded in the landlord’s petition.
The trustees of the Masonic Hall and Asylum Fund (referred to herein as the “ landlord ”), a fraternal corporation organized under the laws of the State of New York, is the owner of premises located at 23rd and 24th Streets at Sixth Avenue in the city of New York. The premises consist of two connected and jointly operated structures of 19 stories, each. The sole tenant involved in this proceeding — Liggett Drug Company, Inc.— (referred to herein as “ Liggett ”) occupies business space of approximately 39,800 square feet on the 12th, 13th, 14th and 15th floors of the structure which fronts on 23rd Street. The balance of space in the 23rd Street structure is occupied largely by commercial tenants, while most of the space in the 24th Street structure is used by the Masonic Order and its affiliates. Because the landlord applies its net income from such building exclusively for charitable and educational purposes, it enjoys an exemption from real estate taxes (see People ex rel. Trustees of Masonic Hall & Asylum Fund v. Miller, 279 N. Y. 137).
The pertinent portion of subdivision 1 of section 4 of the Business Rent Law under which the landlord sought to increase Liggett’s rent provides: “A rent, exceeding in amount the emergency rent, may * * * be fixed * * * by the supreme court. * * * [It] shall be a reasonable rent based on the fair rental value of the tenant’s business space as of the date the application to the supreme court * * * is made * * *. In the determination of the amount of such reasonable rent: (a) due consideration shall be given to the cost of maintenance and operation of the entire property * * * including amount paid for taxes assessed against such property, and to the kind, quality and quantity of services furnished * * #. A net annual return of eight per centum on the fair value of the entire property including the land shall be presumed to be a reasonable return. The assessed valuation of the entire *620 property * * * as shown by the latest completed assessment-roll * * * shall be presumed to be the fair value of the premises, but other lawful evidence of the fair value may be offered and received. * * * [T]he landlord * * * shall serve upon the tenant a verified bill of particulars, setting forth the gross income derived from the entire building * * * during the preceding year # * * the rental charged each tenant * * *; the assessed valuation of the property * * *; the cost of maintenance and operation of the building * * * during the preceding year, the kind, quality and quantity of services furnished during such year; and such other facts as the landlord claims affect the net income of the entire building * * * or the reasonableness of the rent to be charged.”
In accordance with that statute, the pivotal question with which we are here confronted is whether the landlord was earning a reasonable return on its investment.
The statute provides that a net annual return of 8% on the fair value of the entire property shall be presumed to be a reasonable return; and, in turn, it is provided that the assessed valuation of the entire property shall be presumed to be the fair value of such property.
In Steinberg v. Forest Hills Golf Range (303 N. Y. 577, 585), we said: ‘ ‘ The legislature, by providing that ‘ A net annual return of eight per centum on the fair value of the entire property including the land shall be presumed to be a reasonable return ’ * * * has declared its finding as to the return to which a landlord is normally entitled. But that statute, merely creating a presumption, is not a mandate to employ an 8% factor in every case. Obviously, the owner of an unimproved parcel of land found to be valuable because of its availability for development cannot expect to receive the same rate of return upon its value as he would if it were appropriately improved.” (Emphasis added.) The trial court, in the present action, found that the subject premises constituted a sufficiently adequate improvement to warrant the employment of the presumptive 8% factor. This finding was not disturbed by the Appellate Division, and we likewise should not disturb it.
The assessed valuation of the subject premises was $2,050,000, and the statute provides that such valuation shall be presumed *621 .to be the fair value of such property. In conformity with the statute, however, that ‘‘ other lawful evidence of the fair value may be offered and received ’ ’, the landlord’s real estate expert adjudged the value of the subject property to be $2,920,000, and Liggett’s expert estimated the value at $1,325,000 (before conversion of the landlord’s heating and electricity plant) and at $1,775,000 (after such conversion). The trial court, nevertheless, as it had a right to do under the statute, adopted the ■ assessed valuation of $2,050,000 as the fair value of the subject property, and the Appellate Division, in agreeing, stated: 1 ‘ That is the value presumed by statute to be the value of the premises in a proceeding such as this and there is no reason to disturb the finding of the [trial] court in that respect.” Thus was such finding of fair value assented to by the Appellate Division, and we may not disturb it.
We shall now treat of the amount of expenses with which the landlord should be credited. The landlord’s petition, daled February 2, 1953, was filed on February 3, 1953. Its bill of particulars bears the date, March 18, 1953, and its further bill of particulars is dated May 18, 1953. The trial took place in December, 1954. In its bill of particulars, the landlord set forth, inter alia, the costs of maintenance and operation of the subject premises for the year 1952 (the year immediately preceding the date of filing of the landlord’s petition). In addition, it stated that such landlord was then in the process of abandoning the coal-fired high-pressure steam and D.C. electricity generating plant — then in use — and converting to public utility alternating electric current and fuel oil-fired boilers for heating the premises. It was conceded by the landlord’s attorney at the trial that such changeover was completed on May 8,1954. After that date, the landlord no longer generated its own electricity, but purchased the same from a public utility. An officer of the managing agent of the landlord’s premises testified that, on the basis of his study, the above-described changeover would prove to be beneficial and more economical to the landlord. It was shown that it was in fact less expensive per kilowatt hour for the landlord to purchase electricity from a public utility than to generate its own. Liggett’s real estate expert estimated that, as a result of the conversion, the landlord would enjoy an overall saving of well over $100,000, we presume, annually.
*622 Controversy exists, however, to the extent that the landlord asserts that the court may consider only those expenses which were actually incurred during the year before the date of filing of the petition, while Liggett contends that savings in expenses which accrue after the date of filing of the petition but prior to the time of trial may nevertheless be taken into consideration by the court.
The trial court and the Appellate Division, in ruling that cognizance should be taken of such savings in expenses, fixed the expenses of operation as of the time of trial rather than as of the date of filing of the petition. With that determination we are in agreement. The Appellate Division, in that respect, relied upon Matter of Alibel Corp. (Compo Shoe) (285 App. Div. 140) wherein the court stated (p. 143): “ * * * [W]e view the statute [§ 4, subd. 1] as requiring the fixing of the fair rental value as of the date of the application, in the process of which the most relevant factors are the items of income and expenses embraced in the landlord’s bill of particulars supplied for the preceding year. [However], Changes in circumstances having prospective effect but fixed in amount and determined as to obligation or liability prior to the filing of the petition would also be relevant and material. This permits substantial equities to be satisfied * * The latter statement of the foregoing-quoted matter finds support in the statute itself. Among other enumerated items which the landlord must include in its bill of particulars are “ such other facts as the landlord claims affect the net income of the entire building * * * or the reasonableness of the rent to be charged.” The decrease in expense because of the conversion most certainly is a consideration which affects the reasonableness of the rent to be charged. The landlord stated in its bill of particulars that it was in the process of conversion — March 18, 1953. Such bill of particulars, of course, speaks as of the date of the filing of the petition.— February 3, 1953. We may fairly conclude from the record that the conversion was conceived and the actual plan initiated before the date of filing of the petition. The conversion was completed on May 8, 1954 and the trial was had in December, 1954.. We see no reason, therefore, in line with the Alibel case (supra) why the court should not take cognizance *623 of the saving in expense to the landlord as a result of such conversion. (See Matter of Connors, 275 App. Div. 799.)
As stated by the Appellate Division, the experts for both parties were not at great variance in their estimates as to the cost of operating the subject premises. The landlord’s expert estimated such expense to be $361,000, while Liggett’s expert estimated an expense of $348,756.49. The trial court fixed the sum of $350,000 as the reasonable annual expense of operation of the subject property, and such figure was adopted as correct by the Appellate Division. Since such finding is supported by the evidence it is binding upon us.
We shall pass on now to consider what credit, if any, should be accorded the landlord because of real estate taxes. As stated earlier, the landlord, being a fraternal corporation which applies all of its net income for charitable and educational purposes, enjoys an exemption from real estate taxes. The trial court, in ruling that the value of the subject premises should be enhanced by an amount equal to the benefit enjoyed by virtue of the tax exemption, added to the assessed valuation of $2,050,000, the sum of $975,000 (the estimated savings in taxes), so that it arrived at a fair value total of $3,025,000. The latter figure was multiplied by 8% resulting in a reasonable return of $242,000. This theory was rejected by the Appellate Division. In substance, the Appellate Division ruled that the estimated tax saving—«-found to be $75,850 per annum — should be added to the landlord’s allowable return, and not added to the value of the property. Thus did the Appellate Division add the annual tax saving to the initial return and cost of maintenance to arrive at a figure of $625,850 — the total amount which the landlord should receive from the subject property.
We are in agreement with the Appellate Division in that respect. Assuming that the landlord did not enjoy an exemption, it cannot be doubted that the real estate taxes which it had in fact paid would have been.added to the allowable return just as any other expense. An exempt landlord pays taxes in the • sense that it is contributing the fruits of its enterprise to society. Thus, as stated by the trial court, “ the municipality benefits by an amount approximately equal to the taxes which it does not collect.” It is plain, therefore, that the real estate taxes *624 which an exempt landlord pays in such form should be added to the landlord’s allowable return just as any other expense that the landlord is required to bear.
We shall now consider the addition of $450,000 to the assessed valuation of the subject property by the Appellate Division. As stated earlier, both courts below properly took cognizance of the saving in expense as a result of the conversion by the landlord from coal to oil (for heating the premises), and from the self-generation to the purchase of electricity. In view of that consideration, the Appellate Division took the view that the cost of the improvement should be added to the value of the subject property. It adopted the estimate of Liggett’s expert that the value of the improvement amounted to $450*000. This figure of $450,000 was added to the assessed valuation of $2,050,000, thus arriving at a fair value total of $2,500,000. We agree with that determination. Since the courts below considered the savings in expense to the landlord, because of such conversion,. it is plain that the value of the property should be proportionately enhanced. An appropriate yardstick for this increase in value is the cost of the improvement. We find no validity in Liggett’s contention that the increase in value, because of such conversion, was included in the value found by the trial court when it found the value of the property to be the assessed valuation of $2,050,000. The trial court pointed up the “ conversion ” feature for an entirely different reason. It stated: “ Eight per cent is allowed because the uneconomic heating and electricity supply operation has been discontinued. Had this not been done, it is extremely doubtful the existing structures could be considered sufficiently adequate improvements to entitle petitioner to the presumptive return of 8 per cent.” It is clear from the foregoing-quoted matter and a reading of the trial court’s opinion in its entirety that the trial court was referring to the enhancement in value because of the conversion only as a justification for the use of the presumptive 8% factor.
We shall now treat of the amount of income with which the landlord should be charged. It seems that both the- trial court and the Appellate Division were in substantial agreement as to the amount of income from the property, exclusive of the *625 space occupied by the Masonic affiliates. Divergence existed to the extent that the trial court valued such Masonic space at a greater amount than did the Appellate Division. The trial court used the following figures and method of computation to arrive at a total income of $632,893.80: As of the date when this proceeding was commenced, the income from the Masonic affiliates was in the sum of $121,375. As of the time of the trial, however, this rental had increased to $165,917. The trial court found the income from space other than that of the Masonic affiliates to be $381,976.80. Finding that the Masonic space was treated with favor by the landlord, the trial court increased the rental income from such space, for the purpose of this proceeding, an additional $85,000. Thus, by totalling $381,976.80, $165,917 and $85,000, the trial court arrived at $632,893.80 — the total gross income of the landlord. The Appellate Division, on the other hand, used the following figures: It adopted the figure of $475,348.46 from the bill of particulars as the total income from all the space. That figure included the Masonic space rental of $121,375. The Appellate Division (as did the trial court) added to income the amount of $26,175. That figure represented increased rentals to two commercial tenants pursuant to renewal of and graduated leases which were in effect as of the date of filing of the petition. The landlord objects to the inclusion of that amount on the ground that such increases did not in fact become collectible until after the date the petition was filed. We think that contention to be untenable. The figures were mentioned in the landlord’s bill of particulars, such bill of particulars speaks as of the date of filing of the petition, and the amount of rental was fixed although prospective as far as actual collectibility. Thus, under the reasoning of Matter of Alibel Corp. (Compo Shoe) (285 App. Div. 140, 143, supra), since (as of the date the petition was filed) the obligation was fixed in amount, although prospective in effect, the courts below properly took cognizance of the increased rentals of $26,175.
Contrary to the finding of the trial court, the Appellate Division did not recognize for the purposes of this proceeding the increases in rent for the Masonic space from $121,375 to $165,917. The record indicates that such increases took effect on January *626 1, 1954. No mention of such increases was made in the petition or in the bill of particulars. Nor does it appear anywhere in the record that such increases were contemplated at the time when this proceeding was commenced. It would appear, therefore, that these post-petition increases were properly ignored by the Appellate Division. Since the obligation was not fixed in amount as of the date of filing of the petition, nor contemplated at that time, such increases were prospective in their “ inception ’ ’ as well as in effect — thus not within the purview of the Alibel case (supra). (See Matter of Court Square Bldg. v. City of New York, 298 N. Y. 380, 388, 389; Matter of Flatto [Sandler], 279 App. Div. 714; Matter of 161 Columbus Ave. Corp. [Varob], 279 App. Div. 1002.)
Liggett further contends that the landlord, in fixing the rentals of its Masonic affiliates, treated them with favor. In view of that fact, the trial court added $85,000 to the $165,917 rental of such Masonic affiliates — thus constituting a total rental value of $250,917 for such Masonic space. The Appellate Division, on the other hand, while recognizing that the Masonic affiliates were receiving favored treatment, chose to set the rental value of Masonic space at $194,869.71. Liggett asserts that the Appellate Division mistakenly seized upon this figure of $194,869.71 as being Liggett’s éxpert’s estimate of the rental value of Masonic space. It is true that Liggett’s-expert estimated the rental value of all the space in the 24th Street structure (this included a small amount of-non-Maisonic space) at $194,869.71. However, it cannot be said that the Appellate Division was mistaken in using that figure. This is borne out by the following — quoted matter from the Appellate Division’s opinion. “ It is asserted that the sum of $121,375 paid by these lodges was grossly inadequate in view of the special service rendered to them and also because of the nature of the lodge rooms, some of them being two stories in height and one being three stories in height. The tenant’s expert fixed the sum of $194,869.71 as being a fair rental to be charged for the premises occupied by those lodges. There is no supportable basis for a higher figure.” (Emphasis added.) Bather than assume that the Appellate Division was under a misapprehension when it used the figure of $194,869.71, we prefer — and we think it is justified — to assume the contrary. The Appellate Division, *627 in the light of the circumstances and what it said, intended to adopt the figure of Liggett’s expert. When the Appellate Division referred to the underscored “ premises” in the foregoing-quoted matter, we believe that it was referring to the entire 24th Street structure. The great bulk of Masonic space is located in the 24th Street structure, while the 23rd Street structure consists largely of commercial space. The 24th Street structure contains 57,854 square feet of Masonic space, and only 23,310 square feet of commercial space; while the 23rd Street structure contains only 11,425 square feet of Masonic space, and 164,025 square feet of commercial space. As stated by the trial court, “ The maintenance of that structure [24th Street] for the use of the fraternal group requires heating and elevator service evenings and weekends, when such services are not required in the Twenty-third street structure.” The Appellate Division took express cognizance of the special services required for the 24th Street structure when it adopted the figure of Liggett’s expert as the rental value of the entire structure. Liggett, as a commercial tenant in the 23rd Street structure, properly should not have been required to bear the brunt of the special treatment and services which were rendered to the occupants of the 24th Street structure. Thus, in charging the landlord with $194,869.71 rental value for Masonic space (largely located in the 24th Street structure), the Appellate Division, in adopting Liggett’s expert’s estimate of the value of all space in the 24th Street structure, in our judgment, acted correctly and consistently. The inclusion in such estimate of 23,310 square feet of commercial space in the 24th Street structure was offset by the exclusion of the 11,425 square feet of Masonic space in the 23rd Street structure. In any event, the theory employed by the Appellate Division was reasonable and warranted, and the overlapping, if any, would be so minute that it would not affect the result. The trial court recognized the increases in rent of Masonic space, as earlier mentioned, in the sum of $165,917. It valued such space at an additional $85,000 because of the special treatment accorded Masonic affiliates. The Appellate Division, however, as earlier stated, properly ignored the increased rentals, but nevertheless increased the rental value of Masonic space for the purpose of this proceeding from $121,375 to $194,869.71 — an amount of $73,494.71. Using par *628 allel bases, therefore, it is apparent that the trial court valued the Masonic space at an additional amount of $85,000, while the Appellate Division valued it at an additional amount of $73,494.71. Plainly, these figures are not substantially at variance. There is support in the record for either figure and, as we shall show, the use of either figure will produce an identical result in this proceeding. Since such estimated values were conceived only for the purpose of this proceeding, and since the use of either figure will produce the same result, we need not choose one figure over the other.
In summary, the trial court used the following figures and mode of computation in arriving at its conclusion: To the assessed valuation of $2,050,000 (which it found to be the value of the subject property) was added an increment of $975,000 to reflect the value of the tax exemption •— thus resulting in a total fair valuation of $3,025,000. Eight per cent of $3,025,000 is $242,000. The operation expenses of $350,000 were added to the $242,000 — thus resulting in a return of $592,000. The gross receipts for the purposes of this proceeding were found to be $632,893. Since the receipts were greater than the return, the landlord suffered no deficit, and, for that reason, the trial court dismissed the landlord’s petition.
The Appellate Division, with which we are in agreement, in summary, did the following: To the assessed valuation of $2,050,000 was added the value of the conversion improvement of $450,000 — thus resulting in a total fair value of $2,500,000. Eight per cent of $2,500,000 is $200,000. The tax saving of $75,850 and operation expenses of $350,000 were added to the $200,000 — thus resulting in a return- to which the landlord was entitled of $625,850. The gross receipts of the landlord for the purposes of this proceeding were found to be $575,018.17. (That was obtained by totalling income as set forth in the bill of particulars of $475,348.46, increased rentals of the two commercial tenants of $26,175, and the increased value of Masonic space of $73,494.71.) The difference between the return of $625,850 and the receipts of $575,018.17 is a deficit to the landlord of $50,831.83. As mentioned earlier, even if we adopt the trial court’s estimate of the increased value of the Masonic space in the sum of $85,000 instead of $73,494.71, the landlord would still suffer a *629 deficit. (Thus, adding $85,000 to $475,348.46 and $26,175 results in receipts of $586,523.46. Subtracting such receipts of $586,523.46 from the return of $625,850 results in a deficit to the landlord of $39,326.54.) Since all we need find to render subdivision 1 of section 4 operative is a deficit in return to the landlord, it matters not whether we adopt the trial court’s estimate of $85,000 or that of the Appellate Division of $73,494.71.
Having found a deficit, therefore, it remains for us to allocate the return to which the landlord is entitled, so that, in accordance with the nature and amount of space occupied by Liggett, it should bear a proportionate amount in the form of increased rental. Having found that the landlord did not sustain a deficit, it was unnecessary for the trial court to pass on that point. Liggett occupies 39,800 square feet of commercial space on the 12th, 13th, 14th and 15th floors of the structure which fronts on 23rd Street. The real estate experts for the respective parties differed in their estimates as to what percentage of the “ gross rentals from the entire building ’ ’ should be borne by Liggett for the space, it occupies. The landlord’s expert estimated it at 14.408%, and Liggett’s expert estimated it at 11.844%. In adopting Liggett’s expert’s estimate, the Appellate Division said: “ Taking into consideration the nature of the space occupied by the Masonic Lodges and considering all of the other factors we conclude that the tenant should bear the lesser percentage, i.e., 11.844% of the landlord’s allowable return.” There is support in the record for this finding by the Appellate Division and it is therefore binding on us. The allowable return of the landlord, as earlier stated, is $625,850. Using the allocation rate as found by the Appellate Division results in the amount of $74,125.67 (multiplying $625,850 by 11.844%). That figure, in conformity with the Appellate Division’s determination, was properly fixed by that court as the fair rental which Liggett must bear.
One further point remains to be considered. Liggett claims that the buildings comprising the subject property should have been considered separately and not as a single unit. We find no force to that contention. The expert for the landlord described the subject property, in substance, as follows: It is an “ L ” shaped plot which is improved with a 19-story basement, fireproof *630 brick store and office building (fronting on 23rd Street), which is connected with a 19-story basement, fireproof brick store, office and lodge-room building (fronting on 24th Street). The two sections interconnect on all floors and are operated as one unit. Before the conversion to oil-fired heating and public utility electric current, three coal-fired steam boilers supplied heat and electric current for the entire building. Liggett’s expert admitted that the buildings were operated together but he added that the services furnished each were generally quite different. This was so because the 23rd Street structure was made up largely of commercial tenants, and the 24th Street structure was devoted in large part to the purposes of the Masonic Order and its constituent lodges. Many of the rooms used by the Masonic Order in the 24th Street structure are multistory in height; and because the various Masonic lodges gather to meet in the evenings, elevator service, heat and lighting are furnished until the late hours. Those features, among others, are not existent in the 23rd Street structure because it is used principally by commercial tenants.
In that regard, the trial court found: “ In view of the nature of the structures, the purpose for which they were erected, the manner of their operation, and the holding in People ex rel. Trustees of Masonic Hall & Asylum Fund (279 N. Y. 137), I find that these buildings constitute one unit.” This finding was not disturbed by the Appellate Division. In fact, it impliedly indorsed the trial court’s determination that the structures should be considered as one unit when it commented: “ The property consisted of two structures connected on all floors and heated by one heating unit. ’ ’
In People ex rel. Trustees of Masonic Hall & Asylum Fund v. Miller (253 App. Div. 672, revd. 279 N. Y. 137), (referred to and relied upon by the trial court as to the Court of Appeals decision in the foregoing quotation), this landlord was held to be entitled to an exemption from tax. In the Appellate Division in the latter case (253 App. Div. 672, 673), it was said: “ In 1905 the relator purchased property on Twenty-fourth street in the rear of the Twenty-third street premises, upon which, in 1907 and 1908, it erected a building connecting with the buildings on Twenty-third street, so as to form one integral structure covering both lots *631 * * * .” (Emphasis added.) We reversed (279 N. Y. 137) the Appellate Division and ruled that this landlord should be tax exempt, but in no wise did we disturb the Appellate Division’s finding (as hereinabove quoted) that the buildings were connected “so as to form one integral structure ”. That, as claimed by Liggett, the services were of a different nature and extent in the 23rd and 24th Street structures, has nothing to do with the fact that the buildings were recognized, treated and physically operated as one unit. The courts below, therefore, were correct in considering the subject property as one unit in this proceeding.
The order of the Appellate Division appealed from should be affirmed, without costs.
Desmond, Dye, Fuld, Van Voobhis and Bubke, JJ., concur; Fboessel, J., taking no part.
Order affirmed.