## No. C-961

**Mile High Enterprises, Inc., a Colorado corporation v. John F. Dee, Jr., Auditor of the City and County of Denver and The City and County of Denver, a municipal corporation**

(558 P.2d 568)

Decided January 4, 1977.                    Rehearing denied January 31, 1977.

Holme Roberts & Owen, Donald K. Bain, Paul A. Jacobs, Jack L. Richtsmeier, for plaintiff-appellant.

Montgomery, Little, Young, Campbell & McGrew, P.C., Richard O. Campbell, for defendant-appellee.

Max P. Zall, Brian H. Goral, Stanley Ereckson, Jr., for defendant-appellant.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

This action was brought by Mile High Enterprises, Inc. (referred to as "Mile High") against the City and County of Denver (called "City") and the Auditor of the City (referred to as the "Auditor"). Mile High sought a declaration as to the validity of a contract and to compel the Auditor to execute it. Mile High and the City have asserted the same positions, and the Auditor joined Mile High and the City in the request for a declaration of rights and responsibilities. The district court held in favor of the Auditor, ruling that the contract was void. The matter was appealed to the Colorado Court of Appeals to which we granted certiorari under C.A.R. 50 prior to argument and judgment in that court. We reverse the district court.

During 1967 arrangements were made for the City to purchase Bears Stadium, the formal conveyance being in early 1968.[1] Upon acquisition,

---

[1] *Ginsberg v. Denver*, 164 Colo. 572, 436 P.2d 685 (1968), involved the validity of the acquisition of the stadium and the issuance of revenue bonds to finance the enlargement and improvement thereof.

the property was called Denver Municipal Stadium, and shortly thereafter it became known as Denver Mile High Stadium. We refer to it as the stadium.

On March 5, 1968 the mayor issued Executive Order No. 61, which assigned "responsibility for directing all operations, maintenance and concessions" at the stadium to the Manager of the Department of Parks and Recreation. On June 7, 1968, Mile High and the City entered into a contract granting Mile High the right to operate food and beverage concession facilities at the stadium for a period of ten years beginning as of May 1, 1968, in return for payment of agreed compensation to the City determined by gross receipts. This base contract was amended twice in 1969 to clarify the intention of the parties concerning compensation to be paid to the City.

In 1974 the voters of the City approved an expansion which would add several thousand additional seats to the stadium. Construction on the expanded stadium began in late 1974 and still continues. That construction included the destruction of some of the existing concession facilities.

It was foreseen that the expansion would adversely affect Mile High's concession sales and disrupt its concession operation. Also, there was needed a remodeling of the stadium's existing concession facilities, and construction and installation of additional concession facilities and equipment. As a result, Mile High and the City, acting through its Manager of Department of Parks and Recreation, negotiated an amendment to the 1968 contract (called the Third Amendatory Agreement). This amendment was to become effective July 25, 1975. This is the contract here under consideration. The contract extends the term of the original contract for an additional 18 years, commencing May 1, 1978, and obligates Mile High to spend not less than $750,000 and not more than $850,000 to purchase equipment and construct concession facilities adequate to service the expanded stadium. The contract vests in the City title to the new equipment purchased and installed by Mile High, and modifies the gross receipt formula under which the City is to be compensated.

It was stipulated that there had been no bad faith, fraud or collusion involved in the negotiation of the Third Amendatory Agreement. No competitive bids were solicited prior to its execution. The Third Amendatory Agreement was approved by the Mayor's Cabinet as required by executive order. The Manager of the City's Department of General Services is a member of the Cabinet, and he approved the Third Amendatory Agreement. The Auditor, however, refused to become a signatory to it.

Since the time that the City acquired the stadium, annually it has been used approximately 72 days by professional baseball teams, 10 days by professional football teams and 5 or 6 days for activities such as band contests, Boy Scout gatherings and rock concerts. All tenants pay for the

use of the stadium and all spectators are always charged an admission fee.

Article IV of the City's charter relates to the Department of Parks and Recreation. Some of the provisions of this article are as follows:

"[There is vested 'exclusively' in the Department the] management, operation and control of all facilities, either within or without the territorial limits of the City and County, owned by the City and County for park and recreational purposes, including the right to make reasonable charges, subject to ordinance approval, for the use of any special facility or activity and management and control of the operation, care, repair and maintenance of all structures in which and all land on which those facilities are located and operated. . . ." Denver Charter § A4.4-1.

\* \* \* \*

"In the manner and pursuant to terms and conditions fixed by the Mayor's Cabinet, to grant or refuse the license or privilege of operating concessions in or of selling goods and services in all parks and recreational facilities and on the streets and sidewalks within three hundred feet of the boundary of any park or recreational facility." *Id.* A4.4-3.

\* \* \* \*

"No franchise, license or permit for the construction or maintenance of any railway shall ever be granted within the limits of any park or lengthwise upon any parkway nor shall any franchise for the maintenance of any other special privilege within any park be granted; provided, however, that the foregoing shall not be a limitation upon the right of the Department to grant licenses for the operation of concessions or for the sale of goods or services in or near park and recreational facilities and to designate specific areas, structures or parts of structures or to authorize the construction and maintenance of facilities or structures in which licensees or concessionaires shall operate and function." *Id.* A4.6.

Article XII of the charter relates to the Department of General Services. It is there provided:

"The Department shall have the management and control of the occupancy and of the operation, care, repair and maintenance, either by the Department or under contract let by the Department, of all facilities, structures or parts of structures owned or leased by the City and County and used for theatre, concert, auditorium or *arena* purposes whenever such facilities, structures, or parts of structures are regularly rented to others for such purposes and a charge is made for their use or a charge is customarily made for admission thereto. The Department shall also have the management and control of all land on which such facilities or structures are located, and shall have the right to establish and make reasonable charges for the use of such facilities and structures and to do such remodeling thereof as does not require reconstruction, change of design or structural change." (Emphasis added.)

The district court concluded that the stadium came under the category of the provisions of the last quoted portion of the charter (A12.3-5) in that it is a facility of the City used for "arena purposes" and is "regularly rented to others for such purposes and a charge is made for their use or a charge is customarily made for admission thereto." It quoted *Steinberg v. Forest Hills Golf Range*, 303 N.Y. 577, 105 N.E.2d 93 (1952), as to the definition of the word "arena." There the word was generally defined as a central part of an amphitheater, in which combats or spectacular displays take place or as any place of public contest or exertion. The court, therefore, concluded that the Third Amendatory Agreement was and is void because the exclusive power and authority in this contractual area was vested in the Department of General Services. It further concluded that Executive Order No. 61 is void and of no effect insofar as it is inconsistent with the authority granted to the Department of General Services to have the management and control of the stadium.

This conclusion by the district court was predicated upon its finding of the intent of the electors who adopted the charter provisions involved. In this connection, the court stated:

"Like McNichols Arena, Mile High Stadium is a facility with thousands of seats which is used primarily by paying spectators who wish to observe sporting events staged for their entertainment. In this respect the Stadium differs from the facilities managed and controlled by the Department of Parks and Recreation, which are designed to beautify the City and to provide areas in which residents can personally engage in sporting activities and other acts of physical exertion or restful relaxation and diversion. The difference in use between the Parks and Recreation Department facilities and Mile High Stadium is fundamental, while the similarities between the General Services Department Arena facilities and Mile High Stadium are compelling. This analysis leads the Court to conclude that the intent of the framers of the Charter was to place facilities such as the Stadium under the management and control of the Department of General Services. In interpreting the Charter provisions which control the City's government, this clear intent must be given effect."

Were we to decide this case solely on the basis of our interpretation of what is written within the four corners of the above quoted charter provisions, and without any other guidelines, it is conceivable that we would affirm the district court. Removed from such circumscription, we give consideration to the interpretation of the executive and legislative divisions of Denver's government.

Initially, it should be stated that there is another side of the coin of interpretation of the charter provisions already quoted. The charter has granted to the Department of Parks and Recreation duties and powers relating to the management, control and maintenance of facilities owned by the city for park and recreational purposes. It can be argued that the

stadium is for recreational purposes. The charter at § A4.6 states that the provisions of that section shall not be a limitation upon the right of the Department of Parks and Recreation to grant licenses for the operation of concessions in or near recreational facilities. The charter further provides that the granting or privilege is within the powers of the mayor's cabinet, which may fix conditions upon such license. The assertion can be made, therefore, that the provisions relating to the Department of Parks and Recreation could embrace operation of the stadium.

Denver's charter establishes a strong executive department of which the mayor is the chief executive.

"[H]e shall possess, have and exercise, all of the executive and administrative powers granted to the city and county of Denver by article XX of the constitution of the state of Colorado, and all executive and administrative powers contained in the charter of the city and county of Denver . . . except as hereinafter delegated to the departments . . . and . . . other elective officers . . . ." § A1.1.

* * * *

"The mayor and his cabinet (which shall consist of the Manager of the Department of Public Works, the Manager of the Department of Parks and Recreation, the Manager of the Department of Revenue, the Manager of the Department of Health and Hospitals, the Manager of the Department of Safety, the Manager of the Department of General Services, the Manager of the Department of Welfare, and the City Attorney) shall formulate the general administrative policies of the city and county, and each manager and officer in his department, shall be responsible for and have full power to carry out such policies.

. . . ." § A1.7

The charter further provides that the Department of General Services shall have the management, operation and control of all facilities of the city to provide centralized, departmental services common to the several departments and centralized by the mayor for operational and administrative efficiency. § 12.3-2. This portion of the charter then has the following: " . . . provided, however, that the Mayor may assign to another department, agency, board, commission or authority a specific centralized activity or facility which is unrelated to the general scope of duties of the Department, and further, the Mayor may assign a specific segment of a centralized service to another department, whenever such assignment is in the interest of economy, organization, administration and efficiency of the city as a whole."

It is obvious from Executive Order No. 61 and the original 1968 contract, that the mayor who executed those documents believed that under the charter provisions the authority here involved could be delegated to and exercised by the Department of Parks and Recreation. It is likewise obvious that the present mayor in executing the Third Amendatory

Agreement is of like opinion; and the same applies to the present mayor's cabinet for the same reason.

The city council's intent is rather clearly implied. When the foregoing quoted charter provisions were adopted, there was no stadium. About four months following the issuance of Executive Order No. 61, Denver's city council adopted an ordinance which created the Denver Stadium Commission. In this ordinance it was provided: "The [Stadium] Commission shall advise the Manager of Parks and Recreation of the City in the operation, maintenance, and improvement of the Denver Stadium." This unquestionably carries the implication that the city council felt that under the charter the Department of Parks and Recreation had the duties and powers relating to the management, control and maintenance of the stadium.

■ We hold that there can be an interpretation of the charter which would give jurisdiction of the stadium to the Department of Parks and Recreation. This being our ruling, we find the interpretation of the mayor, the mayor's cabinet and the city council as persuasive; and we hold that the delegation of power to, and the exercise of that power by, the Department of Parks and Recreation were valid.

We now consider the issue of whether the Auditor should be ordered to execute the Third Amendatory Agreement. Concerning the Auditor's duties, the charter provides:

"He shall sign all warrants, countersign and register all contracts, [and] see . . . that no liability is incurred, money disbursed or the property of the city and county disposed of contrary to law or ordinance . . . ." § A7.1-1.

Mile High would have us rule that the Auditor's duty of countersignature under the charter is ministerial and involves no exercise of discretion. The district court expressly avoided this issue and stated:

"[T]his Court expresses no opinion and affixes no judicial imprimatur on the Auditor's asserted right to approve or disapprove of each and every contract entered into by the City and County of Denver."

We, too, need not rule generally on this issue. Rather, for the purpose of this case, we follow the statement of the Auditor in his brief, which reads as follows:

"The record does not suggest that the Auditor views the Charter as granting the Auditor the power to veto or to override the decisions of the Mayor or the Departments of the City by an arbitrary refusal to countersign and register contracts. However, in those cases such as this where there is a clear and obvious violation of the Charter, the Auditor must exercise discretion and good faith and refuse, as in this instance, to sign the contract. In the event the Auditor, Mayor or other official abuses the discretion conferred upon him, readily available remedies are available to those who are aggrieved by such action."

■ In other words, the Auditor takes the position that he withheld his countersignature solely because of two clear and obvious violations of the charter. He enumerates the two matters which he believes to be violation. Since we rule that neither of the matters presented were violations, under the Auditor's position it is therefore proper that mandamus issue against him and that he be ordered to countersign the Third Amendatory Agreement.

As to the two reasons, the Auditor states in his brief:

"[T]he Auditor refused to register and countersign the Third Amendatory Agreement on the basis [1] that the contract was not negotiated by the proper party and on the further fact [2] that the contract was not put out for bid as required under the Charter and a certain ordinance of the City and County of Denver."

We have already disposed of the first alleged violation, and thus need to consider the second, namely, that the Third Amendatory Agreemnt was not put out for bid as required by the charter and an ordinance.

■ The asserted charter provisions are contained in Article XII thereof relating to the Department of General Services. These provisions require bidding in certain situations as to property purchased by the City through the Department of General Services. We have not noticed, nor has our attention been called to, any similar charter provisions relating to the Department of Parks and Recreation. Even assuming that the bidding requirement applied to the latter department, we do not have involved here a purchase by the city. The Third Amendatory Agreement provides that Mile High shall purchase the facilities and pay for them. Title to the facilities then vests in the city. Since property *purchased* by the city is not involved, the charter provisions are inapplicable.

■ The ordinance relied upon by the Auditor provides, "Contracts with the Manager of General Services shall be let to the lowest reliable and responsible bidder." Revised Municipal Code of the City and County of Denver. § 161.3-1 A reading of the remainder of the ordinance discloses clearly that purchase of supplies by the city is involved. Since the ordinance is limited to the Manager of General Services and for the additional reason expressed in the preceding paragraph, no violation of this ordinance is involved here.

Before reaching the posterior terminus of this opinion, we feel we should make a parenthetical remark. We have stated that the only problems before us concern the Third Amendatory Agreement. In the light of the district court's ruling as heretofore expressed, the reader of this opinion may well wonder what the position of the district court was as to the validity of the original contract and of the 1969 amendments thereto. In that connection, the district court stated a conclusion that as to the earlier documents "the equitable doctrine of laches" apply. This ruling of the court has not been presented to us and we, therefore, express no opinion as

to its correctness.

The judgment of the district court is reversed and the cause remanded to it with directions to enter a judgment declaring the Third Amendatory Agreement valid and to order the Auditor to countersign it.

MR. CHIEF JUSTICE PRINGLE, MR. JUSTICE LEE and MR. JUSTICE CARRIGAN dissent.


MR. CHIEF JUSTICE PRINGLE dissenting:

I most respectfully dissent. It is clear to me that the facility with which we are dealing is an *arena* and, therefore, originally within the jurisdiction of the Department of General Services. Calling it a *stadium* does not change its character. One is reminded again of the Bard when he says, ". . . .[a] rose by any other name. . . ." William W. Shakespeare, *Romeo and Juliet*, Act II, Scene ii.

I do recognize that the charter provision cited by the majority permits the mayor to transfer jurisdiction of a facility to a department other than that to which it is originally assigned by the charter and it does not disturb me that one department of the executive branch rather than another deals with the subject upon such assignment. But I read nothing in that assignment provision which permits the assignee department to thereupon ignore the restrictions upon which contracts dealing with that facility can be made by the original department. The charter requires bids to be called for by the General Services Department whenever practicable. I must point out that when the transfer was first authorized, the Department of Parks and Recreation did indeed call for bids on this very contract by order of the mayor. But now the department chooses to ignore the restriction requiring bids. I cannot agree that this is proper under the Charter of the City and County of Denver.


MR. JUSTICE LEE dissenting:

I respectfully dissent.

In my view, the district court correctly interpreted the Denver Charter as it relates to the management and control of the Denver Mile High Stadium. Article XII, Sec. A12.3-5. The quoted portion of the district court's findings, as set forth in the majority opinion, persuasively demonstrates the reasons for the conclusion that the stadium falls within that class of facilities included in the charter provision, and which are under the management and control of the Department of General Services.

Reinforcing this conclusion is Sec. A12.3-6, which vests in the Department of General Services the "[*exclusive* power and authority to grant or refuse the license or privilege of operating concessions in or of selling goods and services in the facilities, structures and parts of

structures * * *." (Emphasis added.) Executive and legislative interpretation to the contrary cannot, in my opinion, negate the clear intent of the framers as expressed in these charter provisions.

This conclusion, then, requires that the provisions of Article XII, relating to the letting of contracts and bidding, must be complied with. Sec. A12.4 to A12.4-3. They were not here complied with and the district court properly held the contract to be void.

I would affirm the judgment.

I am authorized to state that MR. JUSTICE CARRIGAN joins in this dissent.

MR. JUSTICE CARRIGAN dissenting:

I respectfully dissent.

The people of Denver, in their charter, adopted a policy generally requiring competitive bidding on city purchases of goods and services whenever practicable. Article XII, Secs. A12.3-1(2), A12.4 to .4-3. The charter grants to the Department of General Services management and control of city auditoriums and arenas. Article XII, Sec. A12.3-5. "Exclusive power and authority to grant or refuse the license or privilege of operating concessions . . ." in such facilities is also granted by charter to the Department of General Services. Article XII, Sec. A12.3-6.

It is apparent from reading these charter provisions in their context, and from considering their interrelation, that the people of Denver have required competitive bidding for concessions at sports facilities such as Mile High Stadium. In a well reasoned opinion the district court so concluded.

The contract in question, which purchased concession equipment and services without competitive bidding in exchange for an eighteen-year concession monopoly, could not have been entered into without public bidding if control of the stadium had not been transferred out of the Department of General Services and into the Department of Parks and Recreation. In my view the charter did not authorize that transfer.

The majority opinion relies, at least in part, on Article XII, Sec. A12.3-2 of the charter as granting the mayor authority to thus transfer control of the stadium between departments. The language relied upon, however, is taken out of context. The full section reads:

"A12.3-2 *Control of centralized services.* The Department shall have the management, operation and control of all facilities owned or established by the City and County to provide centralized, departmental services common to several departments, agencies, boards, commissions or authorities and which services have been consolidated and centralized by the Mayor for operational and administrative efficiency, including, by way of illustration and not by way of limitation, the following: Bulk or general warehousing, storage and issuing of supplies, equipment and personal

property; printing and duplicating; messenger and delivery; addressing and mailing; and telephone service; provided, however, that the Mayor may assign to another department, agency, board, commission or authority *a specific centralized activity or facility which is unrelated to the general scope of duties of the Department*, and further, the Mayor may assign a specific segment of a centralized service to another department, whenever such assignment is in the interest of economy, organization, administration and efficiency of the city as a whole." (Emphasis added.)
Apparently the majority interpret the word "facility" in the proviso clause of this section to cover the stadium.

A careful reading of the entire section, however, demonstrates that it grants the Mayor no such broad transfer power. It only empowers the Mayor to redistribute among departments, agencies, boards and commissions certain *service* functions which he might have consolidated or centralized in the Department of General Services for operational or administrative efficiency. This section was not cited or relied upon in the briefs or at oral argument. It is plainly not applicable. The majority's strained interpretation stretches this section far beyond its obvious purpose and thus negates the plain language of other charter provisions requiring competitive bidding for concessions.

While there is no claim of any improper motive to avoid competitive bidding in the instant case, we must look beyond the immediate case when we interpret charter provisions. Our decision making is not merely an ad hoc process; today's decision is tomorrow's legal precedent. For that reason the effect of the majority opinion on the integrity of the Denver Charter's bidding requirements is of utmost concern to me. These competitive bidding requirements, adopted by vote of the Denver people for their protection, should not be subject, in the future, to avoidance by the transparent device of shifting control of a particular sports gathering place — whether called an arena, stadium, coliseum, park or field — from one city department to another.

I would affirm the judgment.