The DENVER URBAN RENEWAL AUTHORITY, a body corporate and politic of the State of Colorado, Plaintiff and Appellee,

v.

Charles D. BYRNE, Auditor of the City and County of Denver; the City and County of Denver, a municipal corporation; School District No. 1, Denver, Colorado; the Board of Education of School District No. 1, Denver, Colorado; Omar Blair, Individually and as President of the Board of Education of School District No. 1; Virginia P. Rockwell, Individually and as Vice President of the Board of Education of School District No. 1; Naomi Bradford, Robert L. Crider, Marion J. Hammond, Katherine W. Schomp and William R. Schroeder, Sr., Individually and as members of the Board of Education of School District No. 1, Defendants and Appellants.

No. 79SA394.

Supreme Court of Colorado.

Oct. 27, 1980.

Kutak, Rock & Huie, Gregory V. Johnson, Denver, Paul C. Benedetti, P. C., Boulder, for plaintiff and appellee.

Max P. Zall, Robert M. Kelly, Donald E. Wilson, Denver, for defendants and appellants, Charles D. Byrne, Auditor of the City and County of Denver, and the City and County of Denver, a municipal corporation.

Michael H. Jackson, Denver, for defendants and appellants, School Dist. No. 1 and its Bd. of Ed.

HODGES, Chief Justice.

Defendants–appellants, Charles D. Byrne, *et al.*, appealed to this court challenging the district court's order mandating Byrne, Auditor of the City and County of Denver (Auditor), to countersign and register a co-operative agreement between the Denver Urban Renewal Authority (DURA) and the City Council (the Council) for the City and County of Denver (Denver). We affirm the judgment of the district court.

The following facts have been stipulated by the parties. Plaintiff–appellee, DURA, a corporate body politic, *see James v. Board of Commissioners of the Denver Urban Renewal Authority*, Colo., 611 P.2d 976 (1980), was created pursuant to the Urban Renewal Law, section 31–25–101, *et seq.*, C.R.S. 1973 (1977 Repl.Vol. 12). DURA prepared a plan (the plan) for the development of what is known as the "West Colfax Urban Renewal Project" (the project) which was approved by the Board of Commissioners of DURA on January 19, 1978. The plan was submitted to the Council as required by section 31–25–107, C.R.S.1973 (1977 Repl. Vol. 12). The Council determined that the project was in conformity with the compre-

hensive plan for the development of Denver as required by section 31–25–107(2), C.R.S. 1973 (1977 Repl.Vol. 12).

In order to finance the project, the Board of Commissioners of DURA approved on April 6, 1978, the issuance of $2,100,000 in bonds as authorized by section 31–25–109, C.R.S.1973 (1977 Repl.Vol. 12). Both DURA and the Council approved a cooperative agreement whereby the bonds were to be issued as "tax–allocation bonds" in conformance with section 31–25–107(9).[1] The principal and interest of the bonds would primarily be paid from a fund created by a tax–allocation scheme as follows.[2]

Property in the project area would be assigned two valuations. Each parcel of property would be given a "base valuation" representing the valuation immediately prior to the approval of the plan. An "incremental valuation" would also be assigned property within the project area. The incremental valuation would represent the valuation subsequent to the approval of the plan. Taxes would be levied each year upon taxable property within the project area in the usual manner. There would be allocated to public use an amount equal to that portion of the taxes produced by the levy upon the base valuation. However,

1. Section 31–25–107(9), C.R.S.1973 (1977 Repl. Vol. 12) provides:

"(9)(a) Notwithstanding any law to the contrary, any urban renewal plan, as originally approved or as later modified pursuant to this part I, may contain a provision that taxes, if any, levied after the effective date of the approval of such urban renewal plan upon taxable property in an urban renewal area each year by or for the benefit of any public body shall be divided for a period not to exceed twenty–five years after the effective date of adoption of such a provision, as follows:

(I) That portion of the taxes which are produced by the levy at the rate fixed each year by or for each such public body upon the valuation for assessment of taxable property in the urban renewal area last certified prior to the effective date of approval of the urban renewal plan or, as to an area later added to the urban renewal area, the effective date of the modification of the plan shall be paid into the funds of each such public body as are all other taxes collected by or for said public body.

(II) That portion of the taxes in excess of such amount shall be allocated to and, when collected, paid into a special fund of the authority to pay the principal of, the interest on, and any premiums due in connection with the bonds of, loans or advances to, or indebtedness incurred by, whether funded, refunded, assumed, or otherwise, such authority for financing or refinancing, in whole or in part, an urban renewal project within such urban renewal area. Unless and until the total valuation for assessment of the taxable property in an urban renewal area exceeds the base valuation for assessment of the taxable property in such urban renewal area, as provided in subparagraph (I) of this paragraph (a), all of the taxes levied upon the taxable property in such urban renewal area shall be paid into the funds of the respective public bodies. When such bonds, loans, advances, and in-

debtedness, if any, including interest thereon and any premiums due in connection therewith, have been paid, all taxes upon the taxable property in such urban renewal area shall be paid into the funds of the respective public bodies.

(b) The portion of taxes described in subparagraph (II) of paragraph (a) of this subsection (9) may be irrevocably pledged by the authority for the payment of the principal of, the interest on, and any premiums due in connection with such bonds, loans, advances, and indebtedness.

(c) As used in this subsection (9), the word "taxes" shall include, without limitation, all levies authorized to be made on an ad valorem basis upon real and personal property; but nothing in this subsection (9) shall be construed to require any public body to levy taxes.

(d) In the case of urban renewal areas, including single and multiple–family residences, school districts which include all or any part of such urban renewal area shall be permitted to participate in an advisory capacity with respect to the inclusion in an urban renewal plan of the provision provided for by this subsection (9).

(e) In the event there is a general reassessment of taxable property valuations in any county including all or part of the urban renewal area subject to division of valuation for assessment under paragraph (a) of this subsection (9), the portions of valuations for assessment under both subparagraphs (i) and (II) of said paragraph (a) shall be proportionately adjusted in accordance with such reassessment."

2. The bonds are also to be repaid with "project income," defined as income from the sale, lease, or other disposition of real property or improvements within the project area, and any other income DURA receives in conjunction with the project.

any excess revenues, representing the levy upon the incremental valuation minus the base valuation, would then be allocated to a special DURA fund irrevocably pledged to the payment of principal and interest on the bonds. This fund would benefit from the increased valuation of taxable property within the project area after the effective date of the plan's approval. When all the bonds had been retired, no further allocation to the DURA fund would be made. The tax–allocation scheme would continue for a period not in excess of twenty–five years.

The cooperative agreement was submitted to the Auditor for his countersignature, and registration of the agreement, as required by *Denver City Charter* A7.1–1. This section provides that:

"[The auditor] shall sign all warrants, countersign and register all contracts ...; [he shall see] that no liability is incurred, money disbursed or the property of the city and county disposed of contrary to law or ordinance...."

Pursuant to this provision, the Auditor refused to countersign and register the cooperative agreement.

DURA then instituted an action in the district court seeking a declaratory judgment as to the legality of the cooperative agreement and also relief in the nature of mandamus to compel the Auditor to countersign and register the cooperative agreement.[3] The complaint was amended by DURA to join School District No. 1 (the school district) as a party–defendant.[4] The Auditor counterclaimed alleging that the cooperative agreement was unconstitutional and violated the Denver City Charter. All parties moved for summary judgment, which was granted in favor of DURA. The defendants–appellants appealed to this court again challenging the constitutionality of the cooperative agreement. The de-

fendants–appellants concede that the cooperative agreement conforms to section 31–25–107(9), and therefore they directly attack its validity.

## I.

A jurisdictional defect may be noticed at any stage of an action whether or not there has been an assignment of error. *Peaker v. Southern Colorado Water Conservancy District*, 174 Colo. 210, 483 P.2d 232 (1971). Further, standing is a jurisdictional question. *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). *Accord Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1979). If a party lacks standing, the case must be dismissed unless this court's original jurisdiction can properly be invoked pursuant to the doctrine of *in publici juris*. *See generally Board of County Commissioners v. Fifty–First General Assembly*, Colo., 599 P.2d 887 (1979); *Lamm v. Barber*, 192 Colo. 511, 565 P.2d 538 (1977).

Although not raised by DURA, a difficult jurisdictional question is presented in this case. Consequently, we asked the parties to submit supplemental briefs discussing the defendants–appellants' standing to challenge the legality of a state statute. In this case, we are confronted with the question whether Denver, the Auditor, the school district, or the members of the Board of Education of the school district have standing to challenge the constitutionality of a statute enacted by the General Assembly.

A long–standing rule of law is that "political subdivisions of the state, and the officers thereof, lack standing to challenge the constitutionality of a state statute directing the performance of their duties." *Board of County Commissioners v. Fifty–First General Assembly, supra.* This rule has been applied to counties, county officers, and county agencies, *e. g., Board of*

---

**3.** The City and County of Denver is also named as a party–defendant and appellant in the designation of parties before this court.

**4.** A portion of the revenues raised by Denver's tax levy must be paid to the school district for its educational program. *See* section 22–40–

102(1), C.R.S.1973, and section 39–1–111(1), C.R.S.1973. The school district was permitted to participate in an advisory capacity with respect to the tax–allocation provisions of the plan to the extent required by section 31–25–107(9).

*County Commissioners v. Fifty–First General Assembly, supra; Lamm v. Barber, supra; Martin v. District Court*, 191 Colo. 107, 550 P.2d 864 (1976); *Board of County Commissioners v. State Board of Social Services*, 186 Colo. 435, 528 P.2d 244 (1974); *Board of County Commissioners v. Love*, 172 Colo. 121, 470 P.2d 861 (1970); *People v. Hively*, 139 Colo. 49, 336 P.2d 721 (1959); *People v. Pitcher*, 61 Colo. 149, 156 P. 812 (1916); *Ames v. People*, 26 Colo. 83, 56 P. 656 (1899); and also has been applied with respect to school districts. *Denver Ass'n for Retarded Children, Inc. v. School District No. 1*, 188 Colo. 310, 535 P.2d 200 (1975). The rationale for this rule is that "[p]ublic policy and public necessity require prompt and efficient action from [ministerial officers of the state.]" *Ames v. People, supra.* It has similarly been noted that subordinate state political subdivisions, or their officers, may not challenge a state statute unless expressly or impliedly empowered to do so. *Board of County Commissioners v. Love, supra*, wherein it also stated that such political subdivisions of the state exist only "for the convenient administration of the state government, created to carry out the will of the state."

This general rule is harmonious with the two–prong test of standing recently adopted by this court. In *Wimberly v. Ettenberg, supra*, we held that "[t]he proper inquiry on standing is whether the plaintiff has suffered injury in fact to a legally protected interest as contemplated by statutory or constitutional provisions." We reaffirmed the applicability of this test in *Dodge v. Department of Social Services*, Colo., 600 P.2d 70 (1979).

Here, all the defendants–appellants will arguably suffer injury in fact should the cooperative agreement become effective. The general fund of Denver, and consequently, the revenue of the school district, *see* footnote 4, *supra*, will arguably be directly and substantially affected. The difficult question is whether a legally protected interest is implicated. In order to resolve this question, the interests of Denver must be considered separately from the school district's interest.

■ We first consider whether the school district and its board members have a legally protected interest within a statutory or constitutional sense. The long–standing bar preventing political subdivisions and the officers thereof from challenging the validity of state statutes has been expressly applied to school districts. *Denver Ass'n for Retarded Children, Inc. v. School District No. 1, supra.* School districts may not attack a state statute unless there has been conferred upon them a legally protected interest by either statute, *accord, Board of County Commissioners v. Fifty–First General Assembly, supra*, or constitutional provision. No such statutory or constitutional provision has been cited to us. We therefore conclude that the school district, and consequently, the school board members, lack standing in this case.

Whether a home rule city has standing to challenge a state statute is a question which has not been directly addressed by this court. As mentioned above, Denver arguably will suffer an injury in fact. We conclude that Denver has a legally protected interest. Consequently, Denver has standing in this case.

Here, it is asserted on behalf of Denver that Denver's right of home rule, *see generally* Colo. Const. Art. XX, Sec. 6, is violated by section 31–25–107(9) of the Urban Renewal Law. Fundamentally, Denver argues that the statute authorizes the interference with such matters of local concern as the collection and distribution of ad valorem tax revenues and the incurrence of municipal debt.

■ On such questions of local concern, a home rule city is vested with the plenary power of self–government. *Colo. Const.* Art. XX, Sec. 6(h) provides that "[i]t is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the full right of self–government in both local and municipal matters . . . ." This court has stated that:

"In numerous opinions handed down by this court extended over a period of fifty years, it has been made perfectly clear that when the people adopted Article XX they conferred *every power* theretofore possessed by the legislature to authorize municipalities to function in local and municipal affairs." (Emphasis in original.)

*Four–County Metropolitan Capital Improvement District v. Board of County Commissioners*, 149 Colo. 284, 369 P.2d 67, 72 (1962). Thus, by virtue of Article XX, a home rule city is not inferior to the General Assembly concerning its local and municipal affairs. The Colorado Constitution confers upon a home rule city a legally protected interest in its local concerns.

■ Here, Denver asserts that section 31–25–107(9) violates various provisions of the Denver City Charter. Denver also argues that this section is unconstitutional or otherwise invalid because of the manner in which it adversely affects the collection and distribution of ad valorem tax revenues, and the creation of municipal debt. Clearly, Denver has a legally protected interest

in this context as contemplated by *Colo. Const.* Art. XX. We conclude that Denver does have standing to challenge the validity of section 31–25–107(9). *Accord, Board of County Commissioners v. Fifty–First General Assembly, supra; Board of County Commissioners v. Love, supra.*[5]

Since Denver has standing to assert the invalidity of the cooperative agreement, we therefore address the issues which it has raised. *Denver Ass'n for Retarded Children, Inc. v. School District No. 1, supra.*

## II.

■ We first address whether the proposed bond issuance by DURA of tax–allocation bonds pursuant to section 31–25–107(9) violates the constitutional debt limitation provision, *Colo. Const.* Art. XI, Sec. 6[6] or conflicts with Denver's charter debt limitation provision, *Denver City Charter*, A6.17[7] and therefore is unconstitutional pursuant to *Colo. Const.* Art. XX, Sec. 6.

Denver asserts that as a consequence of the tax–allocation structure, it is subjected

---

5. *Denver City Charter* A7.1–1 delegates to the Auditor the power to ensure that "no liability is incurred, money disbursed or the property of the city and county disposed of contrary to law or ordinance . . . ." We do not find it necessary to consider the standing of the Auditor to raise the constitutional questions involved in this case inasmuch as the interests of Denver and its Auditor have merged in their common claims of constitutional invalidity.

6. *Colo. Const.* Art. XI, Sec. 6, provides:
"No political subdivision of the state shall contract any general obligation debt by loan in any form . . . except by adoption of a legislative measure which shall be irrepealable until the indebtedness therein provided shall have been fully paid or discharged, specifying the purposes to which the funds to be raised shall be applied and providing for the levy of a tax which together with such other revenue, assets, or funds as may be pledged shall be sufficient to pay the interest and principal of such debt. Except as may be otherwise provided by the charter of a home rule city and county, city, or town for debt incurred by such city and county, city, or town, no such debt shall be created unless the question of incurring the same be submitted to and approved by a majority of the qualified electors voting thereon . . . ."

7. *Denver City Charter* A6.17, A6.17–1 and A6.17–2 provide:
"No loan shall be made and no bonds shall be issued for any purpose, except in pursuance of an ordinance authorizing the same, which ordinance shall be irrepealable until the indebtedness therein provided for and the bonds issued in pursuance thereof shall have been fully paid."
"No loan shall be created nor bonds issued unless the question of creating the same and issuing the bonds therefor shall be submitted to the vote of the qualified electors of the City and County of Denver and a majority of those voting upon the question by ballot shall vote in favor of creating such debt and issuing such bonds."
"The City and County of Denver shall not become indebted for any purpose or in any manner, to any amount which, including existing indebtedness, shall exceed three per cent (3 per cent) of the actual value as determined by the last final assessment of the taxable property within the City and County of Denver; provided, however, that in determining the limitation of the City and County's power to incur indebtedness, there shall not be included within the estimate bonds issued by the Board of Water Commissioners."

to a general obligation in violation of these constitutional and charter debt limitation provisions notwithstanding the provision of the DURA resolution which provides: "[t]he bonds, interest, and premium ... are not a debt of the City and County of Denver, the State of Colorado, or any political subdivision thereof ...." Denver argues that the bonds are retired by ad valorem tax revenues which would otherwise be available for the payment of Denver's general obligations, and therefore an indebtedness is created within the constitutional or charter sense. We disagree.

While the bonds are partially retired with ad valorem tax revenues, the tax–allocation bond financing scheme is carefully devised so that the monies which will be utilized to retire the bonds would not otherwise have been available to Denver for its general revenue purposes. Taxes are allocated to DURA only in an amount equal to the levy against the increased assessed valuation of property within the project area subsequent to the valuation. To ensure that tax revenues are allocated to DURA based solely upon the increased valuation of property because of the project, section 31–25–107(9)(e) provides that in the event there is a general reassessment of taxable property within any county including any part of the urban renewal project, the valuation of property within the project area shall be proportionately adjusted in accordance with such assessment. The tax allocation structure has been carefully drafted so that there is a direct relationship between the increased valuation of property within the project area, and thus, increased ad valorem tax revenues, and the project financed by the bond issue. Denver has not lost the benefit of any ad valorem tax revenues which would otherwise have been available for its general revenue purposes had the plan never been adopted. See generally Allardice v. Adams County, 173 Colo. 133, 476 P.2d 982 (1970); Ginsberg v. City and County of Denver, 164 Colo. 572, 436 P.2d 685 (1968); Perl–Mack Civic Ass'n v. Board of Directors of Baker Metropolitan and Sanitation District, 140 Colo. 371, 344 P.2d 685 (1959); City of Trinidad v. Haxby, 136 Colo. 168, 315 P.2d 204 (1957); Johnson v. MacDonald, 97 Colo. 324, 49 P.2d 1017 (1935); Reimer v. Town of Holyoke, 93 Colo. 571, 27 P.2d 1032 (1933); Searle v. Town of Haxtun, 84 Colo. 494, 271 P. 629 (1928); Board of County Commissioners of Larimer County v. City of Fort Collins, 68 Colo. 364, 189 P. 929 (1920). See Sigma Tau Gamma Fraternity House Corp. v. City of Menomonie, 93 Wis.2d 392, 288 N.W.2d 85 (1980). Consequently, Denver will not be indebted as a result of the tax allocation financing scheme.

The obligation created as a result of the bond issuance is solely that of DURA. A special DURA fund, supported by the allocation of tax revenues as above discussed, is irrevocably pledged by DURA to repay the principal and interest of the bonds. Since the obligation is DURA's, and not Denver's, we find no violation of the constitutional and charter debt limitation provisions imposed upon Denver. See generally In re Interrogatories of the Colorado State Senate, 193 Colo. 298, 566 P.2d 350 (1977); Lyman v. Town of Bow Mar, 188 Colo. 216, 533 P.2d 1129 (1975); Lewis v. State Board of Agriculture, 138 Colo. 540, 335 P.2d 546 (1957); People ex rel. Rogers v. Letford, 102 Colo. 284, 79 P.2d 274 (1938); Sanborn v. City of Boulder, 74 Colo. 358, 221 P. 1077 (1923).

### III.

Denver also argues on various grounds that the plan results in an unlawful pledge of credit or grant of aid to public or private entities or persons. We disagree.

### A.

■ Denver asserts that the statutory tax–allocation scheme violates Colo. Const. Art. XI, Sec. 1 which provides:

"Neither the state, nor any county, city, town, township, or school district shall lend or pledge the credit or faith thereof, directly or indirectly, in any manner to or in aid of, any person, company, public or private ...."

We first consider whether the plan causes Denver to pledge its credit to DURA. As discussed above, Denver is not indebted as a result of the tax–allocation financing scheme. The obligation incurred is solely DURA's. The DURA resolution authorizing the bonds clearly provides that only DURA is obligated to repay the bonded indebtedness, and the financing scheme bears this out. Prospective investors will not look to the credit of Denver. We conclude that section 31–25–107(9) does not violate *Colo.Const.* Art. XI, Sec. 1 in that there has been no pledge of Denver's credit to DURA. *See In re Interrogatories of the Colorado State Senate, supra; Lyman v. Town of Bow Mar, supra; Allardice v. Adams County, supra; Ginsberg v. City and County of Denver, supra.* *See also Metropolitan Development & Housing Agency v. Leech,* Tenn., 591 S.W.2d 427 (1979); *Tribe v. Salt Lake City Corp.,* 540 P.2d 499 (Utah 1975).

■ Nor do we find, as Denver contends, that there is an unlawful pledge of credit to a private party. Denver argues the cooperative agreement envisions a private party developing land acquired from DURA which subsidizes the redevelopment by the use of proceeds from the bond issuance. The developer, Denver asserts, will be excused from paying its fair share of taxes to the local government as the tax revenues resulting from the levy upon the increased valuation will be used to retire a debt to which the developer is the beneficiary. Denver in its brief, expresses the view that through "artful indirection" there occurs a pledging of credit to a private party developer.

This is a tenuous argument. As discussed above, owners of property within the project area pay the full ad valorem taxes otherwise applicable. *See also* part VIII, *infra.* It is true that a portion of the taxes will be used to retire the bonds issued by DURA to finance the project to which the owner–developers will be indirect beneficiaries. We do not find this, however, to be a pledge of credit to the owner–developers. *See People ex rel. City of Canton v. Crouch,*

79 Ill.2d 356, 38 Ill.Dec. 154, 403 N.E.2d 242 (1980). *See also* part III–B, *infra.*

Denver also argues that DURA has pledged its credit to private party developers in violation of *Colo.Const.* Art. XI, Sec. 1. Assuming DURA falls within this constitutional proscription, we do not agree that DURA has pledged its general credit or assets in support of payment of the bonds. As discussed above, a special fund is created from which the bonds are paid.

### B.

Denver asserts that the tax–allocation scheme results in a donation or grant to private individuals in violation of *Colo. Const.* Art. XI, Sec. 2. This provision states that:

"Neither the state, nor any county, city, town, township, or school district shall make any donation or grant to, or in aid of . . . any person, company, or corporation, public or private . . . ."

Denver argues that the construction of an improvement for the intended purpose of sale or lease to a private corporation or individual violates this constitutional provision. Additionally, Denver takes the position that the payment of relocation benefits by DURA to persons displaced by the project, is authorized by section 31–25–105(1)(j), C.R.S. 1973 (1977 Repl.Vol. 12), and therefore, this provision is violative of *Colo.Const.* Art. XI, Sec. 2.

■ As to Denver's first contention, we find no donation or grant in aid of an individual or corporation which might purchase or lease any of the property acquired by DURA. DURA may not sell, lease, or otherwise transfer real property or improvements at less than fair value. Section 31–25–106(1), C.R.S. 1973 (1977 Repl.Vol. 12). *See Chitwood v. City and County of Denver,* 119 Colo. 165, 201 P.2d 605 (1948). *See also People ex rel. City of Canton v. Crouch, supra; Sigma Tau Gamma Fraternity House v. City of Menomonie, supra; Tribe v. Salt Lake City Corp., supra.* *Accord, Redevelopment Agency of the City of San Pablo v. Shepard,* 75 Cal.App.3d 453, 142 Cal.Rptr. 212 (1977); *R. E. Short Co. v.*

*City of Minneapolis*, Minn., 269 N.W.2d 331 (1978). We also note that there is a strong public purpose served by urban renewal projects. *E.g., Pillar of Fire v. DURA*, 181 Colo. 411, 509 P.2d 1250 (1973); *Rabinoff v. District Court*, 145 Colo. 225, 360 P.2d 114 (1961). *See also* section 31–25–102, C.R.S. 1973 (1977 Repl.Vol. 12). Accordingly, the fact that private interests are indirectly benefited does not render the plan unconstitutional. *See People ex rel. City of Canton v. Crouch, supra; People ex rel. City of Urbana v. Paley*, 68 Ill.2d 62, 11 Ill.Dec. 307, 368 N.E.2d 915 (1977); *Richards v. City of Muscatine*, 237 N.W.2d 48 (Iowa 1975).

### C.

■ We next address Denver's argument that the payment of relocation benefits to persons displaced by the project constitutes an unconstitutional expenditure of public funds in the aid of private persons. Relocation benefits are provided for by section 31–25–105(1)(j). Denver argues that since the relocation benefits are not required under the Colorado or Federal Constitutions, *see Auraria Businessmen v. DURA*, 183 Colo. 441, 517 P.2d 845 (1974), therefore relocation benefits cannot be paid unless they are to be paid from a federally assisted program, in which case, they are required by the Federal Uniform Relocation Acquisition Policies Act of 1970, 84 Stat. 1894 (codified in scattered sections of 42, 49 U.S.C.). We cannot agree with this evasive logic. Merely because DURA is not required to pay an individual's or business' relocation costs does not ipso facto mean that DURA cannot constitutionally pay such benefits.

Relocation benefits will be paid only to persons or businesses displaced by the project, undisputably for a public purpose. *See Rabinoff v. District Court, supra.* Only reasonable relocation benefits as compensation for "moving expenses and actual direct losses (except goodwill or profit)" will be paid, and only if other reimbursement or

compensation is not made. Section 31–25–105(1)(j). The purpose of this provision is to provide supplemental assistance for particular and well-defined losses resulting from relocation. *Auraria Businessmen v. DURA, supra.* No net benefit will accrue to the relocated person or business. As such, there is no violation of Article XI, Section 2. *Lyman v. Town of Bow Mar, supra.*

### IV.

Denver argues that the General Assembly intended that relocation benefits are to be paid only when federal assistance will be available to pay for all or part of the project. *See* section 24–56–101 *et seq.*, C.R.S. 1973.[8] Denver ignores section 31–25–105(1)(j):

"Every authority has all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this part 1, including, but not limited to, the following ...

. . . . .

(j) To make reasonable relocation payments to or with respect to individuals, families, and business concerns situated in an urban renewal area which will be displaced ... for moving expenses and actual direct losses of property (except goodwill or profit) resulting from their displacement for which reimbursement or compensation is not otherwise made including the making of such payments financed by the federal government."

### V.

■ Denver argues that the owner of property within the project area will benefit from the redevelopment of his property, the only expense being an increase in ad valorem tax revenues; whereas, if the property were not located in the project area, the owner would have to pay the costs of redevelopment and also, the increased ad valorem tax revenues. Consequently, Den-

---

**8.** In this case, the payment of relocation benefits is not required by Colorado or Federal law as federal funds are not used to finance the project. *See* 84 Stat. 1894, section 24–56–101, C.R.S. 1973.

ver argues, the owner of property outside the project area is arbitrarily discriminated against in violation of *Colo.Const.* Art. II, Sec. 25 and *U.S.Const.* Amendment 14.

Denver also argues that DURA's acquisition of property within the project area results or will result in a taking of private property for private purposes without just compensation. Denver's reasoning is that since section 31–25–107(9), which provides for the tax–allocation scheme, is unconstitutional, therefore the use of the proceeds from the bond issuance to acquire private property is not for a public purpose and consequently, in violation of *Colo.Const.* Art. II, sections 14 and 15.

Since Denver does not purport to be a member of the class of property owners alleged to be adversely affected, it does not have standing to raise these issues. *American Metal Climax, Inc. v. Butler*, 188 Colo. 116, 532 P.2d 951 (1975). As such, Denver does not have a legally protected interest to assert, nor has it suffered an injury in fact. *See generally Wimberly v. Ettenberg, supra.* *See* Part I, *supra.*

## VI.

■ Denver next argues that the Urban Renewal Law constitutes local or special legislation and therefore violates *Colo. Const.* Art. V, Sec. 25. It is apparent that the statute is a general law uniform in its operation and applies to all similarly situated, and therefore is not local or special legislation. *People v. Gilpin Investment Co.*, 177 Colo. 132, 493 P.2d 359 (1972). *See People ex rel. City of Canton v. Crouch, supra; Richards v. City of Muscatine, supra.* *Cf. Goodwin v. City of Sparks*, 566 P.2d 415 (Nev.1977).

## VII.

Denver argues that *Colo.Const.* Art. XX, Sec. 6, which provides broad home–rule authority to Denver, prohibits the proposed bond issuance. We disagree.

■ Urban blight is a matter of both statewide and local concern. *See generally Metropolitan Development and Housing*

*Agency v. Leech, supra.* *Accord Pillar of Fire v. Denver Urban Renewal Authority, supra.* Consequently, both the General Assembly and a local government can act to alleviate this problem provided the state and the local law do not conflict. *DeLong v. City and County of Denver*, 195 Colo. 27, 576 P.2d 537 (1978); *Pierce v. City and County of Denver*, 193 Colo. 347, 565 P.2d 1337 (1977); *Greeley Police Union v. City Council of Greeley*, 191 Colo. 419, 553 P.2d 790 (1976); *Aurora v. Martin*, 181 Colo. 72, 507 P.2d 868 (1973); *Bennion v. City and County of Denver*, 180 Colo. 213, 504 P.2d 350 (1972); *Vella v. People*, 174 Colo. 465, 484 P.2d 1204 (1971).

■ The local governing body must concur with an urban renewal authority's proposed project before the project can be commenced. Section 31–25–107. However, a local governing body is not required to approve a proposed project. *Id.* Nor does an urban renewal authority have the power to require a local governing body to enter into a tax–allocation financing scheme. Section 31–25–112. Thus, any possible conflict is avoided, and thereby a violation of *Colo. Const.* Art. XX, Sec. 6 is avoided.

## VIII.

Denver questions whether the tax–allocation financing scheme violates *Colo.Const.* Art. V, Sec. 35 which provides:

"The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise, or interfere with any municipal improvement, money, property, or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever."

We cannot agree with Denver's contention that the statutory tax–allocation financing scheme is an improper delegation of power to DURA to supervise or interfere with the levying and collection of taxes, as well as committing municipal funds derived from Denver's general revenue.

■ The purpose of this constitutional provision is to prevent the intrusion upon

a municipality's domain of local self–government. *Holyoke v. Smith*, 75 Colo. 286, 226 P. 158 (1924). There can be no reasonable argument that DURA can intrude upon Denver's power to levy ad valorem taxes, or commit municipal funds. The local governing authority must have approved the plan and agreed to the cooperative tax–allocation financing scheme. DURA has not interfered with Denver's right of self–government. Rather, Denver has determined for itself, by virtue of the Council's decision, whether to approve the plan and enter into the cooperative agreement. No improper delegation of power has occurred. *Accord Karsh v. City and County of Denver*, 176 Colo. 406, 490 P.2d 936 (1971).

Nor do we agree with Denver's position that there has been an illegal delegation of legislative power from the General Assembly or the local governing body to a non–elected, non–representative board. In support of this argument, Denver cites *Greeley Police Union v. City Council*, 191 Colo. 419, 553 P.2d 790 (1976). Denver's reliance on this case is misplaced. The issue there concerned the constitutionality of compulsory binding arbitration of all unresolved municipal–police union labor disputes arising from collective bargaining. We do not find this case analogous to the case presently before us.

### IX.

Denver next asserts that the tax–allocation financing scheme causes non–uniform taxation in violation of four provisions of the Colorado Constitution. The provisions which are purportedly violated are *Colo. Const.* Art. X, Sections 3, 8, 9, and 10. These sections require the uniform assessment of property and levying of taxes, and prohibit the release of any property from its proportionate share of taxes. We will first address whether section 3 is violated by the tax–allocation financing scheme, and then whether sections 8, 9, and 10 are likewise violated.

█ *Colo.Const.* Art. X, Sec. 3 provides: "All taxes shall be uniform upon each of the various classes of real and personal property located within the territorial limits of the authority levying the tax . . . ."

Denver contends that this provision is violated because of the unequal distribution of its ad valorem revenues. Specifically, Denver argues that this provision is violated because a portion of the tax revenues from the levy upon property within the project area are allocated to DURA for retirement of the bonds.

*Colo.Const.* Art. X, Sec. 3, however, has not been held to require equal distribution of tax revenues, nor do we today render such an interpretation. Rather, this provision requires that the burden of taxation be uniform on the same class of property within the jurisdiction of the authority levying the tax. *Citizens Committee For Fair Taxation v. Warner*, 127 Colo. 121, 254 P.2d 1005 (1953); *Leonard v. Reed*, 46 Colo. 307, 104 P. 410 (1909); *Ames v. People*, 26 Colo. 83, 56 P. 656 (1899); *Palmer v. Way*, 6 Colo. 106 (1881). It is apparent from the discussion that the tax burden upon owners of property within the project area and other owners of property within Denver is the same. Accordingly, we find no violation of *Colo.Const.* Art. X, Sec. 3. *See generally People ex rel. City of Canton v. Crouch, supra; State ex rel. Schneider v. City of Topeka*, 227 Kan. 115, 605 P.2d 556 (1980); *Sigma Tau Gamma Fraternity House Corp. v. City of Menomonie, supra; Metropolitan Development and Housing Agency v. Leech, supra; Richards v. Muscatine, supra.*

█ We next address whether the plan unconstitutionally excludes certain property from its proportionate share of municipal taxes. The relevant constitutional provisions are *Colo.Const.* Art. X, Sections 8, 9, and 10,[9] which "proscribe the legislative

---

9. *Colo.Const.* Art. X, Sec. 8 provides:
   "No county, city, town, or other municipal corporation, the inhabitants thereof, nor the property therein, shall be released or dis-

charged from their or its proportionate share of taxes to be levied for state purposes." Although the language of this provision refers only to taxes levied for state purposes, it

power to impair the financial base of government operations." *Allardice v. Adams County, supra,* at 158, 476 P.2d at 995. *See also Ames v. People,* 26 Colo. 83, 56 P. 656 (1899). Denver argues that a portion of the ad valorem tax revenues is allocated to DURA and therefore is no longer available for Denver's general revenue purposes.

We have heretofore discussed the impact of the tax–allocation financing scheme upon Denver. It is not indebted, nor does Denver lose the benefit of its tax revenues which would have otherwise been available for its use. The portion of tax revenues allocated to DURA represent the amount generated by virtue of increased property valuation which would not have existed but for the project. In this light, it becomes clear that the fiscal base of Denver is not impaired.

### X.

■ We next address the question whether the tax–allocation financing scheme constitutes an impairment of contracts in violation of *U.S.Const.* Art. I, Sec. 10, and *Colo.Const.* Art. II, Sec. 11. Denver argues that the prior general obligation bonds are impaired as a result of the tax–allocation arrangement. Specifically, Denver argues that subsequent to the tax–allocation financing scheme a portion of ad valorem tax revenues is allocated to DURA, and therefore a limitation is placed upon Denver's "full faith and credit" previously pledged in support of repayment of its general obligations. We disagree with this contention.

The ad valorem tax revenues previously available for repayment of Denver's general obligations will likewise be available after the plan is adopted and the tax–allocation scheme is operative. That portion of the ad valorem tax revenues allocated to DURA

also applies to taxes levied for municipal purposes. *Allardice v. Adams County, supra.* *Colo.Const.* Art. X, Sec. 9 provides:
"The power to tax corporations and corporate property, real or personal, shall never be relinquished or suspended."
*Colo.Const.* Art. X, Sec. 10 provides:

represents the amount generated as a result of increased property valuation due to the project. *See* part II, *supra.* Therefore, since Denver has not lost the benefit of any tax revenues which would have otherwise been available, no impairment of contracts has occurred. *See generally Richards v. City of Muscatine, supra.*

### XI.

Section 31–25–113, C.R.S. 1973, a provision of the Urban Renewal Law, provides:
"No authority created by this part 1 has any power to levy or assess any ad valorem taxes, personal property taxes, or any other form of taxes, including special assessments against any property."

Notwithstanding this clear prohibition, Denver maintains that DURA does levy and assess ad valorem taxes, and therefore the financing scheme is void. As discussed above, however, DURA does not levy and assess ad valorem taxes. Nor can DURA so act as section 31–25–113 expressly precludes an urban renewal authority from having any power of taxation.

### XII.

■ The final issue before us is whether the district court properly ordered the Auditor to countersign and register the cooperative agreement as required by *Denver City Charter* A7.1–1. The Auditor refused to countersign and register the cooperative agreement on the ground that to do so might violate his obligation to ensure that "no appropriation of funds is overdrawn or misapplied and that no liability is incurred, money disbursed or property of the city and county disposed of contrary to law or ordinance ...." *Denver City Charter* A7.1–1. Since the cooperative agreement and the tax–allocation financing scheme is not unlawful, mandamus was therefore proper to

"All corporations in this state, or doing business therein, shall be subject to taxation for state, county, school, municipal and other purposes, on the real and personal property owned or used by them within the territorial limits of the authority levying the tax."

compel the Auditor to countersign and register the agreement. *Mile High Enterprises v. Dee*, 192 Colo. 326, 558 P.2d 568 (1977).

The judgment of the district court is accordingly affirmed.